995 So.2d 351 (2008)
William James DEPARVINE, Appellant/Cross Appellee,
v.
STATE of Florida, Appellee/Cross Appellant.
No. SC06-155.
Supreme Court of Florida.
September 29, 2008.
Rehearing Denied November 18, 2008.
*356 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant/Cross Appellee.
Bill McCollum, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Assistant Attorney General, Tampa, Florida, for Appellee/Cross Appellant.
PER CURIAM.
This case is before the Court on appeal by William James Deparvine from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V,  3(b)(1), Fla. Const. For the reasons explained below, we affirm Deparvine's convictions and sentences.

PROCEEDINGS TO DATE
William James Deparvine appeals his convictions for the first-degree murders of Richard "Rick" Van Dusen ("Rick") and Karla Van Dusen ("Karla") and one count of armed carjacking. The State's theory of the case was that Deparvine responded to the Van Dusens' attempts to sell a 1971 Chevrolet Cheyenne pickup truck ("truck") and he subsequently murdered them and took the truck.

GUILT PHASE
According to testimony at trial, the Van Dusens placed an ad in the St. Petersburg Times ("Times") seeking to sell their truck from February 11, 2003, to March 14, 2003. In March 2003, Rick placed the truck on consignment with auctioneer Stuart Myers, who testified that Rick placed a reserve price of $17,000 on the truck and rejected a bid of $15,000. Unable to sell the truck, the Van Dusens ran another ad from July 8, 2003, to August 8, 2003, asking for $14,500. The Van Dusens ran a final ad in the Times from November 20, 2003, to December 21, 2003, asking for "$13,700 or partial trade for four wheel drive jeep."
*357 The State presented the testimony of Christopher Coviello, the Van Dusens' neighbor, who stated that on November 25, 2003, the day before the Van Dusens' bodies were discovered, he saw the Van Dusens driving away from their house in Tierra Verde, which is approximately twenty minutes southwest of the St. Petersburg area, between 5:15 p.m. and 5:45 p.m. Coviello saw Rick driving the truck by himself and Karla driving a Jeep, also owned by them, by herself and following Rick. The State was able to use the Van Dusens' cell phone records which indicated the cell towers used to track the Van Dusens' movement on November 25, 2003. The Van Dusens' phone records indicated that between the times of 4:45 p.m. and 6:37 p.m., they moved northeast from their home in Tierra Verde through the St. Petersburg area and ended up north of St. Petersburg around the Oldsmar area. Their bodies were discovered on November 26, some 3.4 miles from the last recorded cell tower used by the Van Dusens in Oldsmar.
One of the phone calls Karla made during this time period was to her mother, Billie Ferris, which began at approximately 5:54 p.m. This phone call began by using a cell tower located on Central Avenue in St. Petersburg and lasted approximately thirty-seven minutes, ending with the use of the cell tower in Oldsmar. Over defense counsel's objections, Ferris testified that during this conversation, when she heard the motor of the car running in the background, she asked Karla whether she was in the car, and Karla responded:
A: I'm following Rick and the guy that bought the truck. He knows where to get the paperwork done tonight.
. . . .
Q: [State]: Did Karla Van Dusen tell you how the guy was going to pay for the truck that night?
A: She said he's got cash.
The very next morning, on November 26, the bodies of Rick and Karla were found along a dirt road next to a residence, approximately one mile east of Oldsmar. Rick was shot once in the back of the head. He was found with his wallet and money clip containing eighty-three dollars, two gold rings, a cell phone, and a watch. Karla was shot twice in the head and stabbed twice in the chest. She was found with four gold rings, gold hoop earrings, and a watch. Detective Chuck Sackman testified that he discovered a knife blade and a nine millimeter shell casing under her body.
The Jeep, owned by the Van Dusens, was discovered 1.3 miles away from their bodies at a local business. Detective Sackman testified that the windshield was cracked and that he recovered a bullet fragment from the dashboard, a shell casing between the passenger front seat and the doorway, a bullet fragment on the front passenger floorboard, a global positioning system (GPS) device and an address book on the front passenger seat floorboard, a black purse on the passenger seat, and two cell phones from the center console. On the ground floor next to the Jeep on the driver's side was a Florida identification (ID) card belonging to Henry Sullivan. Castings were made from the footprints and tire marks around the Jeep.
Chief forensic print analyst Mary Ellen Holmberg analyzed the prints lifted from the interior and exterior of the Jeep and one lifted from Sullivan's ID card, but none of them matched Deparvine. Latent print analyst Kimberly Cashwell analyzed the knife blade discovered under Karla's body, but was not able to lift any prints of value for comparison. Footwear and tire crime scene analyst Lynn Ernst eliminated Deparvine's shoes as a match with the castings taken from the scene. Ernst also *358 eliminated the Van Dusens' truck as having made the tire marks around the Jeep.
Blood stains were found throughout the driver and passenger sides of the Jeep. Susannah Ulrey, a laboratory analyst for the Florida Department of Law Enforcement, testified that she analyzed five blood samples taken from different points on the steering wheel of the Jeep, and four of them matched Deparvine's DNA, including one mixture blood stain containing Deparvine's and Rick's DNA. Amber Moss, a supervisor of forensic case work at Orchid-Cellmark, a private laboratory, testified that the two blood samples she analyzed, which were taken from different locations on the steering wheel of the Jeep, matched Deparvine, thus totaling six different blood stains on the steering wheel that were linked to Deparvine's DNA. Numerous other blood samples were taken from inside the Jeep and the Van Dusens' clothing, but none of those matched Deparvine.
On November 27, 2003, Professor Raymonda Letrice Burgman, who lived near Deparvine's apartment complex, discovered the 1971 Chevrolet truck parked there, and called the police. Detective Charles Keene secured and executed a search warrant for Deparvine's apartment on December 24, 2003. He discovered a document indicating a 1971 Chevy Cheyenne pickup truck for sale and a handwritten note with a phone number and a list of fourteen questions regarding the truck. One of the documents indicated that the Van Dusens' truck was being sold for $18,900. Detective Keene also found an affidavit, dated December 12, 2003, wherein Deparvine was requesting a vehicle title application for the truck, an insurance policy for the truck in Deparvine's name, and old truck repair documents indicating Rick's name. A notarized bill of sale from Rick to Deparvine, dated November 25, 2003, was also discovered indicating a purchase price of $6,500. Susan A. Kienker, who notarized this bill of sale, later testified that Rick, whom she knew personally, asked her to notarize the bill of sale on November 25, 2003, and handwriting expert Don Quinn confirmed Rick's handwriting on the bill of sale as authentic. No guns were discovered at Deparvine's apartment.
George Harrington testified that he came into contact with Deparvine in August 2003, when Harrington was seeking to sell his 1996 F-150 pickup truck for approximately $7,800. Harrington testified that Deparvine wanted to purchase the truck, but before he did, he asked to take the truck to Oldsmar where his mechanic friend would inspect it. Deparvine indicated that he would pay for the truck in cash, which he kept at his friend's house in Oldsmar. Deparvine gave Harrington a blank bill of sale and told him to have it notarized, which he did, but the sale was never completed, and Harrington never met or spoke with Deparvine's Oldsmar friend.
Deparvine testified in his own defense and stated that prior to November 2003, he was looking to purchase a pickup truck during a six-month period. He said that he saw the Van Dusens' February, July, and November ads and inquired about the truck in February, July, September, and November. Deparvine testified that on the Sunday morning of November 23, 2003, he spoke with Rick, who gave him directions to his house in Tierra Verde. When Deparvine arrived, Rick offered to let Deparvine test drive the truck. Deparvine drove the truck and Rick came along, but within three-quarters of a mile, the truck ran out of gas and the two men abandoned the truck on the side of the road and walked back to the Van Dusen home. At the home, Rick picked up a can of gas, which already contained approximately *359 three-quarters of a gallon of gas, and the two men rode in the Jeep back to the truck with Rick driving.[1] Rick poured gas in the gas tank, but the truck did not start. They decided to "prime the carburetor," which Deparvine testified involves pulling the air cleaner assembly off the carburetor, and pouring gas into the carburetor while another person turns the key in the ignition. Rick turned the key in the ignition while Deparvine primed the carburetor. During this process, Deparvine states that he opened a wound and scab under his right index finger, which originated as a cut he received at work. After they were able to start the truck, Rick drove the truck to the gas station while Deparvine followed driving the Jeep. Rick then put gas in the truck and the two drove back to the Van Dusens' home, with Deparvine still driving the Jeep. Deparvine testified that he stayed at the home for approximately two hours during which Rick showed him an original title to the truck. Deparvine told Rick that he only had $6,500 in cash to pay for the truck, which Rick accepted because he just wanted to get rid of the truck. Rick was able to show Deparvine that there were no liens on the truck; and Deparvine then paid $1,500 in cash as a deposit, for which Rick wrote out a receipt. Deparvine gave Rick a blank bill of sale for Rick to complete and they agreed that the Van Dusens would deliver the truck to Deparvine's apartment complex in central St. Petersburg on Tuesday, November 25, 2003, after 5 p.m.
Deparvine testified that on November 25, 2003, at approximately 5:30 p.m., Rick arrived at the apartment complex driving the truck and Karla followed driving the Jeep. Deparvine told the Van Dusens to drive around to the back parking lot of the complex to complete the sale. Deparvine then noticed a person driving a red vintage truck that was similar to the 1971 Chevrolet and seemed to be with the Van Dusens. Deparvine described the driver of the similar truck as a white male in his mid-fifties with a salt-and-pepper-colored beard, a receding hairline, and wearing sunglasses. On cross-examination, Deparvine admitted that this description was consistent with his own appearance. Once at the back parking lot, Rick exited his truck and entered the passenger side of the Jeep. Deparvine entered the Jeep and sat in the backseat behind Karla. Deparvine then paid the $5,000 remaining balance of the sales price in cash and Rick gave him a notarized bill of sale indicating a purchase price of $6,500. According to Deparvine, Rick had not been able to find the title but agreed to send it to Deparvine after Thanksgiving. After Deparvine exited the Jeep, Rick entered the similar red vintage truck Deparvine had seen and the two vehicles left, with Karla following the red truck in the Jeep. Deparvine testified that after the Van Dusens left, he did not leave the vicinity of his apartment complex. He denied killing the Van Dusens.
When asked how he obtained funds to purchase the truck, Deparvine testified that he sold a Rolex watch that he inherited while he was in prison from a terminally ill inmate named Bill Jamison, whom he had befriended. Deparvine testified that because the Rolex was not on his prison personal property list, he had to smuggle the watch outside of the correctional facility by hiding it in the ground in the visitors park. Joseph Fish, a customer service manager with the St. Petersburg Times, *360 testified that Deparvine placed a one-day advertisement on October 26, 2003, to sell a Presidential Rolex watch. Deparvine testified that he sold the watch for $7,000 to the first people that came by his house, who were "a couple of Hispanic guys." Deparvine could not give any other description of these buyers. Instead of depositing the funds from the sale in his bank account, Deparvine testified that he kept the cash at his apartment. The highest balance ever recorded in Deparvine's bank account between June 27, 2003, and December 31, 2003, was $826.21.
The defense also presented testimony from Martha Baker, who lived behind the Van Dusens and shared the fence to the back end of their respective homes. Baker testified that on the night of November 25, 2003, between 7:15 p.m. and 7:50 p.m., while she was entertaining guests, she heard Karla's voice coming from the Van Dusen home.
Deparvine's cell phone records revealed that he received a call on the night of November 25, 2003, from his ex-wife at 8:57 p.m., but because the call went unanswered, the cell phone did not record any cell tower. Nevertheless, Deparvine received a text message that night at 9:13 p.m., which used a tower on Central Avenue in St. Petersburg. At 5:35 a.m. on November 26, 2003, Deparvine's phone records indicate that he checked his voice mail using the same St. Petersburg tower.
On August 3, 2005, a jury found Deparvine guilty of both counts of first-degree murder and one count of armed carjacking.[2]

PENALTY PHASE
During the penalty phase, the State presented the testimony of Officer Richard Gordon, who testified that on April 28, 2003, Deparvine was on conditional release for possession of a firearm by a convicted felon and carrying a concealed weapon. The State then presented five witnesses as victim-impact testimony: (1) Michelle Kroger, Rick's youngest daughter; (2) Jay Meyers, Karla's son; (3) Christine Crawford, who read a statement prepared by Rene Koppeny, Rick's daughter; (4) Morene Cancelino, Rick's sister, who read a statement prepared by Rick's other sister, Jacqueline Bonn; and (5) Billie Ferris, Karla's mother.
The defense presented three witnesses. Sara Flynn, a mitigation specialist, testified about Deparvine's background. Flynn testified that her investigation did not reveal any examples of happy or loving times during Deparvine's childhood. Flynn testified about Deparvine's estrangement from siblings, nieces, nephews, and parents. His parents were very strict and Deparvine received no affection or words of encouragement from them. Deparvine married his teenage girlfriend, who had become pregnant, and worked hard to put himself through college and law school. On cross-examination, Flynn testified that there had not been any history of sexual or physical abuse.
Kelly Cousineau and Katina Holthus, Deparvine's daughters, testified. Cousineau testified that Deparvine was a loving, affectionate, and involved father. She also testified that she had not seen Deparvine for fifteen years. Holthus has kept in better contact with Deparvine, testifying that she had visited him several times over the years while he was in prison. Holthus also testified that Deparvine was a loving and involved father.
*361 On August 4, 2005, the jury recommended that Deparvine be sentenced to death by a vote of eight to four on both murder counts. A Spencer[3] hearing was held on November 22, 2005, wherein two witnesses testified. Dr. Eric Rosen, a psychologist, testified that Deparvine showed "elevated scales for depression and also for psychopathic deviance," and that although he does not suffer from a "full personality disorder," he suffers from personality disorder traits and was diagnosed as having dysthymic mood disorder, which is a type of depression. Nevertheless, Dr. Rosen testified that Deparvine was above average in intellect and that his personality disorder shaped the choices he made, but did not limit his ability to make choices. Kourtney Deparvine, Deparvine's youngest daughter, testified similarly to her two sisters during the penalty phase.
On January 9, 2006, the trial court sentenced Deparvine to death, finding four aggravating factors and giving them all great weight. The trial court found that the murders were (1) cold, calculated and premeditated ("CCP"); (2) committed for pecuniary gain; (3) committed by a person previously convicted of a felony and under sentence of imprisonment, or placed on community control, or on felony probation; and (4) committed by one previously convicted of another capital felony. The trial court gave little weight to Deparvine's mitigating circumstances, finding that Deparvine: (1) suffered from serious emotional deprivation as a child because of familial dysfunction; (2) suffered from inability to form and maintain close relationships with others; (3) suffered from estrangement from some family members; (4) persevered after marrying his teenage girlfriend, who had become pregnant, and worked hard to put himself through college and law school; and (5) was once a true family man and his children grieve at the predicament they found him in.

GUILT-PHASE CHALLENGES

I. HEARSAY
Deparvine challenges his convictions on several grounds.[4] First, Deparvine argues that the trial court erred in admitting Karla's mother's testimony regarding the hearsay statements made by Karla about where she was and who she was with during the telephone conversation that ended in Oldsmar. The State contended and the trial court ruled that these statements were admissible under the statutory spontaneous statement exception to the hearsay rule, which does not require a startling or exciting event as a prerequisite to admission. Deparvine objected at trial and now on appeal, and cites Hutchinson v. State, 882 So.2d 943 (Fla.2004), for the proposition that a startling event is a necessary predicate for allowing a statement under the spontaneous statement exception. See id. at 951 ("Both the excited utterance and the spontaneous statement exceptions require the declarant to be laboring under the influence of a startling event at the time that the statement is made."). In Hutchinson, this Court held that although it was error to introduce hearsay statements made over a telephone conversation as excited utterances, the error was harmless. Id. at 952. We conclude that certain dicta in Hutchinson erroneously blurred the distinctions between the spontaneous statement and excited utterance exceptions to the rule barring admission of hearsay statements.[5] In order to *362 resolve the issue presented by Deparvine we find it necessary to look at the history and development of the spontaneous statement and excited utterance exceptions to the hearsay rule in order to clarify their scope and meaning.

Res Gestae
While Florida generally bars the admission in evidence of out-of-court statements made by someone else to a witness as impermissible hearsay, we have also recognized exceptions to this rule. Prior to July 1, 1979, the effective date of Florida's evidence code in criminal cases,[6] the spontaneous statement and excited utterance exceptions were parts of a group of exceptions subsumed under the term "res gestae." State v. Jano, 524 So.2d 660, 661 (Fla.1988) (citing State v. Johnson, 382 So.2d 765 (Fla. 2d DCA 1980); 1 Frank T. Read, Read's Florida Evidence 693 (1987)). "The term res gestae seems to have come into common usage in discussions of admissibility of statements accompanying material acts or situations in the early 1800s." 2 McCormick on Evidence  268, at 245 (Kenneth S. Broun et al. eds., 6th ed.2006) [hereinafter McCormick].[7] As one Florida district court has explained:
`Res Gestae,' is a Latin term translated literally as `things done'; and it embraces the circumstances, facts, and declarations which are incident to the main fact or transaction and which are necessary to demonstrate its character. It also includes words, declarations, and acts so closely connected with a main fact in issue as to constitute a part of the transaction.
Washington v. State, 118 So.2d 650, 653 (Fla. 2d DCA 1960) (citing Underhill's Criminal Evidence  266, at 664 (5th ed.)).
Differing views of the policy reasons for the res gestae exception have been expressed. In 1881, Professor James Bradley Thayer reviewed the cases discussing res gestae and concluded that this was an exception based on the contemporaneousness of statements. James Bradley Thayer, Bedingfield's Case.ÔÇöDeclarations as a Part of the Res Gesta, 15 Am. L.Rev. 71, 83 (1881). He interpreted the law as creating *363 an exception for statements "made by those present when a thing took place, made about it, and importing what is present at the very time."[8]Id. On the other hand, another legal scholar, Wigmore, saw as the basis for the exception, not the contemporaneousness of the exclamation, but rather the "nervous excitement" produced by "certain external circumstances of physical shock, . . . which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." 6 Wigmore, supra note 7,  1747, at 135. Although courts initially accepted Professor Wigmore's view of the "exciting event" requirement of res gestae evidence, courts eventually began to also admit contemporaneous statements under the res gestae label without requiring the statements' association with an exciting or startling event. 2 McCormick, supra,  271, at 251-52.
The revival of this broader theory of the res gestae exception has been credited to the commentary of Edmund Morgan, who noted in 1922:
A statement by a person as to external events then and there being perceived by his senses is worthy of credence for two reasons. First, it is in essence a declaration of a presently existing state of mind, for it is nothing more than an assertion of his presently existing sense impressions. As such it has the quality of spontaneity. . . . Second, since the statement is contemporaneous with the event, it is made at the place of the event. Consequently the event is open to perception by the senses of the person to whom the declaration is made and by whom it is usually reported on the witness stand. The witness is subject to cross-examination concerning that event as well as the fact and content of the utterance, so that the extra-judicial statement does not depend solely upon the credit of the declarant.
Edmund M. Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922) [hereinafter Morgan, Suggested Classification] (footnotes omitted);[9]see also Booth v. State, 306 Md. 313, 508 A.2d 976, 979 (1986). Morgan continued, "The declaration is `instinctive, rather than deliberativeÔÇöin short, the reflex product of immediate sensual impressions, unaided by retrospective mental action. These are the indicia of verity which the law accepts as a substitute for the usual requirements of an oath and opportunity for cross-examination.'" Morgan, Res Gestae, supra note 8, at 96 (quoting Ill. Central R.R. Co. v. Lowery, 184 Ala. 443, 63 So. 952, 953 (1913)).[10]
*364 Later, the committee drafting the Model Code of Evidence, led by Edmund Morgan, included both an exception for an excited utterance and a separate exception for present sense impression in the tentative drafts proposed to the American Law Institute (ALI). Douglas D. McFarland, Present Sense Impressions Cannot Live in the Past, 28 Fla. St. U.L.Rev. 907, 909 (2001). The ALI eventually accepted both:
Evidence of a hearsay statement is admissible if the judge finds that the hearsay statement was made
(a) while the declarant was perceiving the event or condition which the statement narrates or describes or explains, or immediately thereafter; or
(b) while the declarant was under the stress of a nervous excitement caused by his perception of the event or condition which the statement narrates or describes or explains.
Id. (citing Model Code of Evidence Rule 512 (1942)).
The only mention of the rule during the three years the ALI debated the proposed evidence code was the following statement of Professor Morgan presenting the rule: "Subdivision (b) is accepted now almost everywhere. Subdivision (a) is not accepted in a number of jurisdictions. Subdivision (a) is what Mr. Thayer thought represented the law with reference to this matter; Subdivision (b) is Mr. Wigmore's view of it; we adopt both."
Id. at 909 n. 15 (citing 18 A.L.I. Proc. 165 (1941)).
In 1953, the National Conference of Commissioners on Uniform State Laws, which was again led by Morgan, proposed the Uniform Rules of Evidence. Id. at 911.
In the area of spontaneous statements, the drafters crafted a narrower present sense impression, a similar excited utterance, and a broad new statement of recent perception. These three exceptions were placed into the same rule:

Contemporaneous Statements and Statements Admissible on Ground of Necessity Generally. A statement (a) which the judge finds was made while the declarant was perceiving the event or condition which the statement narrates, describes or explains, or (b) which the judge finds was made while the declarant was under the stress of a nervous excitement caused by such perception, or (c) if the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action.
Id. (citing Unif. R. Evid. 63(4) (1953)). "The drafters of the Federal Rules of Evidence, following Thayer and Morgan instead of Wigmore, included the present sense impression as the first-listed exception to the hearsay rule, rule 803(1)." Id. at 912. Thereafter, in 1975, Congress enacted the Federal Rules of Evidence,[11] which contained a separate and specific exception for present sense impressions *365 from the hearsay rule, and defined it as, "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed.R.Evid. 803(1).

Florida Evidence Law
A review of Florida's case law reveals that Professor Thayer's broad view of the res gestae exception was applied in Florida as early as 1942. In Tampa Electric Co. v. Getrost, 151 Fla. 558, 10 So.2d 83 (1942), an assistant to an electric lineman was permitted to testify that the lineman told him that he had called the plant and ordered the power in the line cut off. Id. at 84. The lineman had proceeded to work on the wire and was electrocuted. Id. This Court held the conversation was admissible, observing that "the statement was not infected with the vices which make such declarations usually inadmissible. At the time it was uttered there was no occasion for it to have resulted from reflection or premeditation, nor was there motive to make it self-serving." Id. at 85.[12]
Nevertheless, Wigmore's theory requiring a startling event in order for the res gestae exception to be invoked was more often referenced in Florida's case law before the adoption of the evidence code. Declarations were found admissible under the res gestae label if the declarations
were the natural emanations or outgrowths of the act or occurrence in litigation, although not precisely concurrent in point of time, if they were yet voluntarily and spontaneously made so nearly contemporaneous as to be in the presence of the transaction which they illustrate and explain, and were made under such circumstances as necessarily to exclude the idea of design or deliberation.
State v. Williams, 198 So.2d 21, 22 (Fla. 1967) (quoting Washington v. State, 86 Fla. 533, 98 So. 605, 608 (1923), wherein a declaration emanating two minutes after a shooting was admitted); see also Johnson v. State, 314 So.2d 248, 251 (Fla. 1st DCA 1975) (applying a four-pronged test: the statement must be the natural emanation or outgrowth of the act or occurrence in litigation, made contemporaneously with the act of violence, made voluntarily and spontaneously, and made without any indication of reflection or premeditation); Elmore v. State, 291 So.2d 617, 619 (Fla. 4th DCA 1974) (applying a four-pronged test: the statement must be spontaneous, made by one who witnessed the act concerning which the statement was made, made at the scene of the homicide, made in the sight or hearing of the accused or victim, and made about a relevant material issue in the case), overruled on other grounds by Martin v. State, 342 So.2d 501, 503 (Fla. 1977). To be sure, in Florida "the act or *366 occurrence in litigation" referred to a violent act, an exciting event that produced a declaration out of nervous excitement. See, e.g., Johnson, 314 So.2d at 251 (affirming admission of statements that emanated fifteen to thirty minutes after a stabbing); Lawrence v. State, 294 So.2d 371, 373 (Fla. 1st DCA 1974) ("Res gestae refers to statements made immediately before, or immediately after the commission of a crime, by the accused, victim, or a bystander, as a spontaneous reaction or utterance stimulated by the excitement of the occasion." (quoting Charles Torcia, Wharton's Criminal Evidence  297, at 60 (13th ed.1972))); Elmore, 291 So.2d at 619 (holding statement of an unidentified bystander, which was made at the murder scene and within seconds of the shooting, was admissible), overruled on other grounds by Martin, 342 So.2d at 503; Washington, 118 So.2d at 653 ("Statements or acts of the injured person made or done at a time immediately prior to the offense or so near to it as to preclude the idea of forethought, and tending to elucidate a main fact in issue may be admissible as part of the res gestae." (citing 22 C.J.S. Criminal Law  672, at 1063)). In Johnson, the First District explained, "The rationale for permitting testimony relating to spontaneous exclamations is that `such utterances spring spontaneously and instinctively from the stress or pain or excitement caused by the act of violence and are made so soon after the act as to preclude the idea of deliberation, fabrication or design.'" 314 So.2d at 251 (quoting 4 A.L.R.3d 149, 154).[13]

Florida's Evidence Code
When Florida adopted the evidence code in 1979, the Legislature did not use the term "res gestae," but instead broke down the "res gestae" group into various components. See Jano, 524 So.2d at 661; see also State v. Adams, 683 So.2d 517, 520-21 *367 (Fla. 2d DCA 1996).[14] Florida's spontaneous statement and excited utterance exceptions now provide:
The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
(1) SPONTANEOUS STATEMENT.ÔÇöA spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.
(2) EXCITED UTTERANCE.ÔÇöA statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
 90.803(1)-(2), Fla. Stat. (2003). Commenting specifically on Florida's spontaneous statement exception to the hearsay rule, Professor Ehrhardt has explained:
Hearsay statements are admissible under section 90.803(1) when they are spontaneous and describe or explain an event, and if they are made while the person is perceiving the event, or immediately thereafter. There must be a substantial contemporaneity between the event and the out-of-court statement. The spontaneity of the statement negatives the likelihood of conscious misrepresentation by the declarant and provides the necessary circumstantial guarantee of trustworthiness to justify the introduction of the evidence. If more than a "slight lapse of time" has occurred between the event and the statement, the spontaneity is lacking. There is not a requirement for an exciting or startling event or condition for statements to be admitted under section 90.803(1); neither the language of the exception or the policy supporting it require the startling event or condition.
1 Charles W. Ehrhardt, Florida Evidence  803.1, at 841-42 (2007 ed.) [hereinafter Ehrhardt, Florida Evidence] (footnotes omitted). Quoting Professor Ehrhardt, this Court has noted that the two exceptions, though they often overlap, differ mainly in the amount of time that may elapse between the event and the statement describing the event. Jano, 524 So.2d at 661-62 (quoting 1 Charles W. Ehrhardt, Florida Evidence  803.2, at 473-74 (2d ed.1984)).[15]
The Law Revision Council's Notes to section 90.803 state that both the spontaneous statement and excited utterance exceptions "proceed upon a theory that under *368 appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify introduction of the evidence at the trial even though the declarant may be available." 6C Fla. Stat. Ann. 268 (West Publishing Co.1979) (Law Revision Council noteÔÇö1976). A spontaneous statement is trustworthy because "the substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misinterpretation." Id. This language corresponds to that used by the Advisory Committee Note in the present sense impression exception under Federal Rule of Evidence 803(1) when discussing the underlying theory of the present sense impression. See Fed.R.Evid. 803(1) advisory committee's note.[16] It appears that the only difference between the federal and Florida rules for admission of spontaneous statements of present sense impressions of an event is the added provision in the Florida rule that evidence is not admissible, even though it meets the other requirements of section 90.803(1), when the "statement is made under circumstances that indicate its lack of trustworthiness."[17]  90.803(1), Fla. Stat. "This provision enables the judge to bar the admission of statements that lack sufficient reliability. The drafters were particularly concerned with statements by unidentified bystanders. The court should weigh any corroborating evidence together with all other factors in making this determination." Ehrhardt, Florida Evidence, supra,  803.1, at 843 (footnote omitted); see, e.g., Wal-Mart Stores, Inc. v. Jenkins, 739 So.2d 171, 171-72 (Fla. 5th DCA 1999).
Thus, it appears that Florida has adopted the spontaneous statement exception as a separate and distinct exception to the hearsay rule just as it was adopted by the federal rules under the present sense impression exception. Further, it appears the present sense impression was adopted as a restatement of the earlier res gestae exception which does not require an exciting or nervous stimulus as a condition for admission. Under this view, the main policy underlying the exception is a belief in reliability based upon the contemporaneousness of the report of an event. Morgan, Res Gestae, supra note 6, at 96.[18] *369 Hence, Florida's spontaneous statement exception is consistent with Professor Thayer's early view that declarations are admissible when "made by those present when a thing took place, made about it, and importing what is present at the very time." Thayer, supra, at 83.[19]

Case Law Under The Evidence Code
Since the adoption of the evidence code, this Court has stated:
A spontaneous statement must be made "at the time of, or immediately following, the declarant's observation of the event or condition described." J.M. v. State, 665 So.2d 1135, 1137 (Fla. 5th DCA 1996). This exception requires that "the statement must be made without the declarant first engaging in reflective thought." Id. The statements admitted under section 90.803(1) are limited to statements which "describe or explain" an event. Charles W. Ehrhardt, Florida Evidence  803.1, at 772 (2005 ed.).
Ibar v. State, 938 So.2d 451, 467 (Fla.2006). Other cases, however, have suggested a continuing requirement of a startling event. As noted, in Hutchinson, this Court stated, "Both the excited utterance and the spontaneous statement exceptions require the declarant to be laboring under the influence of a startling event at the time that the statement is made." 882 So.2d at 951. In Lyles v. State, 412 So.2d 458 (Fla. 2d DCA 1982), the Second District held, "In order for the spontaneous statement exception to the hearsay rule to be applicable, there must be some occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflecting." Id. at 460. In State v. Skolar, 692 So.2d 309 (Fla. 5th DCA 1997), the Fifth District held a 911 call inadmissible because it was "not made as the result of a startling or stressful event, and it therefore cannot qualify under  90.803 as either a spontaneous statement or an excited utterance." Id. at 311. However, because we now conclude that this view requiring a startling event in order for the spontaneous exception to apply is contrary to the underlying principles embodied in section 90.803(1), we now reject this view.

This Case
We must now determine how the spontaneous statement exception as defined above should be applied here. It appears that Florida courts have not had occasion to decide a factual issue like the one this *370 case presents. "The relative infrequence of such cases results from the fact that unexciting events do not often give rise to statements that later become relevant in litigation." 2 McCormick, supra,  271, at 252. Nevertheless, it is important to note that Florida courts have made clear in both pre- and post-evidence code cases that a narrative of past events cannot qualify as spontaneous statements or excited utterances. See, e.g., Green v. State, 93 Fla. 1076, 113 So. 121, 123 (1927); Mariano v. State, 933 So.2d 111, 116-17 (Fla. 4th DCA 2006); Charlot v. State, 679 So.2d 844, 845 (Fla. 4th DCA 1996).
In Deparvine's case, Karla's mother testified that she heard the sound of the car motor running and asked Karla whether she was in the car. Ferris's testimony indicates that Karla immediately responded: "I'm following Rick and the guy that bought the truck. He knows where to get the paperwork done tonight."[20] We agree with the State that the first statement does not narrate or refer to a past event. Instead, it describes or explains a contemporaneous event, i.e., Karla's then location and status, as she perceived it. As Karla perceived it, she was driving and following Rick and the guy who bought the truck. Indeed, even defense counsel conceded during oral argument that the implication asserted in the statement that Karla was driving and that she was following Rick would have been admissible under the contemporaneous statement exception.
Deparvine contends, however, that Karla's statement "and the guy that bought the truck" is a statement of identification, which indicates reflective thought. However, the fact that Karla explained her contemporaneous status in terms of the presence of her husband and the other person riding in the truck, whose identities were known from past experiences, does not lessen the spontaneity or reliability based thereon. We conclude that any reflection on identity, if it could even be called reflection, is not the type of reflection that the rule would limit. Of course there should be a concern with reflection on facts indicating a lapse of time wherein the declarant had the opportunity to reflect on a past event or condition perceived. This may even encompass the exclusion of a declaration on identity where the facts indicate that the declarant was referring to a past event and had the opportunity to reflect on who the person was in that event. However, in Deparvine's case, Ferris's testimony indicates that Karla simply and spontaneously blurted out that she was then "following Rick and the guy that bought the truck" as a contemporaneous report and description of her present circumstances.[21]
*371 Indeed, other jurisdictions that have addressed this issue have admitted hearsay statements of identification under the exception for present sense impressions. See, e.g., United States v. Hawkins, 59 F.3d 723, 730 (8th Cir.1995) (admitting as present sense impression a 911 call describing that "my husband just pulled a gun out on me"), rev'd on other grounds, 516 U.S. 1168, 116 S.Ct. 1257, 134 L.Ed.2d 206 (1996); United States v. Accetturo, 966 F.2d 631, 633 & n. 3 (11th Cir.1992) (admitting statement identifying extortionist, "That's Tony," made to police agents who had gone with declarant to airport to stage an undercover operation); United States v. Delaplane, 778 F.2d 570, 574 (10th Cir. 1985) (allowing "Michael's back" as a present sense impression); State v. Flesher, 286 N.W.2d 215, 216, 218 (Iowa 1979) (allowing as a present sense impression, "It's Joan").
We find none of the cases Deparvine cites in support for his proposition deal with a spontaneous statement of identification. Instead, they deal with statements regarding past and future events that were based upon information the declarant had reflected upon and processed. Thus, we conclude that the trial court did not err in introducing Karla's statement that she was "following Rick and the guy that bought the truck" as part of a contemporaneous statement admissible under the spontaneous statement exception in the evidence code.
However, we conclude the other statements, "He knows where to get the paperwork done tonight" and "[h]e's got cash," are not descriptive or explanatory of the current conditions Karla was perceiving. Although Ferris's testimony indicates that these statements may have been uttered contemporaneously with Karla's report, those statements fail to describe or explain her present perceptions and thus fail to qualify as spontaneous statements. Both of these statements contain historical information that Karla learned at some earlier time and was simply now recounting to her mother. Neither is a description of a contemporaneous event or observation. It was therefore error for the trial court to admit these statements over counsel's timely objections.[22]

Harmless Error
To justify affirmance of a conviction or sentence despite error at trial, the State must establish beyond a reasonable doubt on appeal that the error did not contribute to the jury's verdict. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). If a reviewing court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful. Id. at 1139. In this case we conclude beyond a reasonable doubt that the admission of the statements, "He knows where to get the paperwork done tonight" and "He's got cash," *372 which immediately followed the statements we have concluded were properly admitted, did not contribute to Deparvine's convictions.
Ferris testified that Karla told her over the phone that she was "following Rick and the guy that bought the truck." This statement, which we have already held was properly admitted, was especially damaging to Deparvine because it placed him with the victims traveling north from St. Petersburg to Oldsmar on the evening in question and it directly contradicted Deparvine's testimony that he did not travel with the victims after he purchased the truck. In comparison to this evidence, the erroneously admitted statements add very little, if anything, to the case for the prosecution. In fact, the objections at trial focused on the first statement placing the victims with the buyer of the truck. There was no attempt by defense counsel to parse the statements in terms of their admissibility.
Indeed, at oral argument, appellate counsel acknowledged that although the State may have referenced the other statements, the "key to the whole thing" and the "main harm" was on Karla's statement placing Deparvine with the victims. As noted above, the record reflects that the State's primary focus in relying on this evidence was on Karla's statement that she was following Rick and the truck's buyer, hence identifying the buyer as being with them at a critical time and location in relationship to their deaths. Thus, the major benefit to the State's case and the damage to the defense arose from the properly admitted evidence. The statement "[h]e knows where to get the paperwork done tonight" is unimportant insofar as proof of the crimes being charged. Furthermore, the statement "[h]e's got cash" is likewise of little consequence because Deparvine himself testified at trial that he paid with cash.
While the main thrust of a harmless error analysis under DiGuilio is to ensure that the error did not affect the verdict rather than a determination of whether there was other substantial evidence to support guilt, DiGuilio permits an examination of the other evidence of guilt in a resolution of the harmfulness issue. We can compare the permissible evidence on which the jury could have legitimately relied to the potential impact of the erroneously admitted evidence. Id. We have already outlined other substantial evidence of Deparvine's guilt earlier in this opinion including the obviously important evidence that Deparvine's DNA matched six spots of blood found in the victims' Jeep, one of which was a mixture of Rick's and Deparvine's DNA. We do not repeat it here. However, when we consider the negligible value of the erroneously admitted statements, together with the totality of the evidence, we hold that there is no reasonable possibility that the erroneously admitted statements contributed to Deparvine's convictions.

II. MURDER CHARGE: INDICTMENT AND JURY INSTRUCTIONS
As Deparvine's second challenge on appeal, he argues that the indictment charging him with two counts of murder in the first-degree was void for failure to specify whether the State would pursue a conviction under a theory of premeditation or felony murder. Deparvine contends that this failure results in a jurisdictional defect that warrants resubmission to a new grand jury. The State contends that Deparvine has waived this issue for review because he waited until after the State rested to move to dismiss the indictment. The trial court agreed with the State.
*373 On January 28, 2004, a grand jury returned a five-count indictment against Deparvine. Counts one and two read:
COUNT ONE
The Grand Jurors of the County of Hillsborough, State of Florida, charge that WILLIAM JAMES DEPARVINE, between the 25th day of November, 2003, and the 26th day of November, 2003, inclusive, in the County of Hillsborough and State of Florida, did unlawfully and feloniously kill a human being, to-wit: RICHARD VAN DUSEN or any other human being by shooting him with a deadly weapon, to-wit: a firearm, and during the course of the commission of the offense, the said WILLIAM JAMES DEPARVINE, discharged a firearm and as a result of the discharge, death was inflicted upon RICHARD VAN DUSEN, contrary to the form of the statute in such cases made and provided, to-wit: Florida Statute 782.04(1)/775.087(2), and
COUNT TWO
The Grand Jurors of the County of Hillsborough, State of Florida, charge that WILLIAM JAMES DEPARVINE, between the 25th day of November, 2003, and the 26th day of November, 2003, inclusive, in the County of Hillsborough and State of Florida, did unlawfully and feloniously kill a human being, to-wit: KARLA VAN DUSEN or any other human being by shooting her with a deadly weapon, to-wit: a firearm, and/or stabbing her with a deadly weapon to-wit: a sharp object, and during the course of the commission of the offense, the said WILLIAM JAMES DEPARVINE, discharged a firearm and as a result of the discharge, death was inflicted upon KARLA VAN DUSEN contrary to the form of the statute in such cases made and provided, to-wit: Florida Statute 782.04(1)/775.087(2).
Generally, if an indictment or information fails to completely charge a crime under the laws of the state, the defect can be raised at any time. State v. Gray, 435 So.2d 816, 818 (Fla.1983). However, "Where a defendant waits until after the State rests its case to challenge the propriety of an indictment, the defendant is required to show not that the indictment is technically defective but that it is so fundamentally defective that it cannot support a judgment of conviction." Ford v. State, 802 So.2d 1121, 1130 (Fla.2001).
In Ford, the defendant was indicted for sexual battery with a firearm, child abuse, and two counts of first-degree murder. Id. at 1125. After the State rested its case in the guilt phase, defense counsel challenged the propriety of the indictment on the child abuse charge for the first time. Id. at 1130. This Court held that although the statute cited in the indictment encompassed three separate child abuse offenses, "Any inquiry concerning the technical propriety of the indictment should have been raised prior to trial at which time any deficiency could have been cured. The indictment as worded adequately placed Ford on notice that he was charged with a violation of the child abuse proscriptions of section 827.03." Id. Similarly, in Garcia v. State, 492 So.2d 360 (Fla.1986), the defendant filed several pretrial motions attempting to dismiss the indictment on the ground that the indictment did not charge a violation of the laws of the state, but there was no motion to dismiss specifically stating that the attempted murder charge did not allege premeditation. Id. at 368. We concluded that the technical defect, having not been challenged during pretrial, did not require dismissal because
[e]vidence of premeditation was presented and the jury instructed that attempted *374 first-degree murder must either arise from premeditated design or be committed in the perpetration or attempted perpetration of a robbery. . . . It is clear to us that there was not a complete omission of an essential element and the indictment was not so vague as to mislead or prejudice appellant.
Id. As with Ford and Garcia, we conclude that Deparvine's challenge also came too late and was properly rejected by the trial court. We also reject his challenge on the merits and find the indictment adequately charged first-degree murder, thereby allowing the State to proceed on the theory of premeditation and felony murder.
Even if the failure to specifically allege premeditation may have been a technical defect, defense counsel failed to challenge the indictment before trial. Rather, prior to trial, defense counsel filed a motion for a statement of particulars as to aggravating circumstances and as to the theory of prosecution, which is governed by Florida Rules of Criminal Procedure 3.140(n). See Fla. R.Crim. P. 3.140(n). To properly challenge the sufficiency of an indictment, defense counsel needed to move to dismiss the indictment under Florida Rules of Criminal Procedure 3.190(b)-(c). See Fla. R.Crim. P. 3.190(b)(c). Thus, Deparvine now must show that the indictment is so fundamentally defective that it cannot support a judgment of conviction.
However, we note that the wording in the indictment placed Deparvine on express notice that he was charged with a violation of the first-degree murder statute set out in section 782.04(1), Florida Statutes (2003), and the indictment included factual allegations as to the manner in which death was inflicted. That statute encompasses both premeditated and felony murder. Upon review we conclude that there was not a complete omission of an essential element and the indictment was not so vague as to mislead or prejudice Deparvine or so fundamentally defective that it cannot support a judgment of conviction.
We also reject the related claim that the trial court erred in instructing the jury that it could find premeditated murder, felony murder, or both, when the indictment only charged first-degree murder and cited the first-degree murder statute, but did not specify any specific theory. However, we have never held that the State (or a grand jury), must designate in the indictment or information the specific theory charged, so long as the defendant is put on notice that he is charged with first-degree murder under the relevant statute. Indeed, we have held that even where the State expressly charges premeditation it may nevertheless proceed under an alternative felony murder theory. O'Callaghan v. State, 429 So.2d 691, 695 (Fla.1983); see also Knight v. State, 338 So.2d 201, 204 (Fla.1976).

III. CARJACKING CHARGE
Deparvine also contests several aspects of the carjacking charge, including the indictment, the jury instructions, the jury's unanimity in reaching a guilty verdict, and the sufficiency of the evidence. The crux of Deparvine's argument is that the 1971 Chevrolet truck was never specified as the subject motor vehicle of the carjacking charge in the indictment, and the State's arguments as well as the trial court's instructions may have confused the jury as to whether it was the truck or the Jeep that was claimed to have been carjacked.
Initially, we reject any claim that the indictment insufficiently described the motor vehicle that was the subject of the carjacking. Deparvine did not attack the indictment on this ground in the trial court. We also reject Deparvine's contention *375 that the State contended that the Jeep, not the truck, was the subject of the carjacking charge in count five. The State did not argue to the jury that the Jeep was the subject of the carjacking. The most that can be said of the State's arguments during discussions on the motion for judgment of acquittal and outside the presence of the jury is that the State asserted that Deparvine may also have seized the Jeep to get back to the truck after the murders, but, nevertheless, the State asserted his "ultimate goal is the unlawful taking . . . of the truck." The State focused on its theory that Deparvine coveted the truck and murdered the Van Dusens to get it. The State argued that Deparvine "intended to obtain, acquire that truck by whatever means necessary" and that "[i]t was a robbery for that title [(referring to the ownership title of the truck)]."
Indeed, after reviewing the record on the court's instructions and the State's closing argument, we do not agree with Deparvine that there was a genuine risk that the jury was confused or that unanimity was compromised in considering the carjacking charge. In closing argument, the State never made any arguments that the Jeep was carjacked or stolen. Rather, the State began its closing argument stating, "Why kill for a truck, a truck, a motor vehicle, something as common and accessible as a truck? Because that truck was coveted by this defendant." Similarly, in defense counsel's closing argument, counsel focused on rebutting the State's theory that the truck (and not the Jeep) was stolen. For example, defense counsel stated, "Common sense tells you that any devious plan to steal a truck, much less kill people, much less with a person with legal knowledge would not have left a trail a mile wide and big flashing arrows pointing directly to the guilty person." On this record, we reject the claim that there is a genuine risk that some members of the jury may have convicted Deparvine of carjacking the truck while others may have convicted him of carjacking the Jeep.
We also reject Deparvine's claim of error on the carjacking instructions. We agree with the State that defense counsel never objected to the instructions on the basis argued here.[23] Where a defendant does not object to the jury instructions at trial, the defendant waives the issue for appellate review unless the error, if any, is fundamental. State v. Weaver, 957 So.2d 586, 588 (Fla.2007) (citing Reed v. State, 837 So.2d 366, 370 (Fla.2002)). In State v. Delva, 575 So.2d 643 (Fla.1991), we explained:
To justify not imposing the contemporaneous objection rule, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." In other words, "fundamental error occurs only when the omission is pertinent or material to what the jury must consider in order to convict." Failing to instruct on an element of the crime over which the record reflects there was no dispute is not fundamental error and there must be an objection to preserve the issue for appeal.
Id. at 644-45 (citations omitted) (quoting Brown v. State, 124 So.2d 481, 484 (Fla. 1960), and Stewart v. State, 420 So.2d 862, 863 (Fla.1982)). In Deparvine's case, the instructions properly tracked the language of the indictment and the statute. See  812.133, Fla. Stat. (2003).
Furthermore, we reject Deparvine's argument that there was insufficient *376 evidence to support his conviction of carjacking. Although Deparvine argues that the carjacking charge could not be based on the taking of the truck because there is no evidence regarding what may have occurred before the Van Dusens were killed, Florida Statutes provide: "An act shall be deemed `in the course of the taking' if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events."  812.133(3)(b), Fla. Stat. (2003). Whether the Van Dusens were murdered after Deparvine took possession is irrelevant since a reasonable jury could infer from the evidence that the taking was the consequence of a continuous series of acts or events all focused on the taking of the truck.

IV. SUFFICIENCY OF THE EVIDENCE
We have also reviewed the sufficiency of evidence regarding Deparvine's first-degree murder conviction. Even though Deparvine has not challenged the sufficiency of the evidence on appeal, this Court will "independently review the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction." Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005) (citing Mansfield v. State, 758 So.2d 636, 649 (Fla.2000)), cert. denied, ___ U.S. ___, 127 S.Ct. 104, 166 L.Ed.2d 63 (2006).
"Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence." Reynolds v. State, 934 So.2d 1128, 1145 (Fla.2006) (citing Pagan v. State, 830 So.2d 792, 803 (Fla.2002)). "If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Reynolds, 934 So.2d at 1145. "However, where a conviction is based wholly upon circumstantial evidence, a special standard of review applies." Darling v. State, 808 So.2d 145, 155 (Fla.2002) (citing Jaramillo v. State, 417 So.2d 257 (Fla. 1982)).
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Darling, 808 So.2d at 155 (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)). Therefore, "`circumstantial evidence can be sufficient to sustain a conviction' provided that the evidence is (1) `consistent with the defendant's guilt' and (2) `inconsistent with any reasonable hypothesis of innocence.'" Delgado v. State 948 So.2d 681, 689-90 (Fla.2006) (quoting Orme v. State, 677 So.2d 258, 261 & n. 1 (Fla.1996)).
In Deparvine's case, the State's evidence was entirely circumstantial, and the special standard of review applies. Applying this standard, we hold that the State has presented competent, substantial evidence that is consistent with Deparvine's guilt and inconsistent with any reasonable hypothesis of innocence.
First, the State presented evidence consistent with Deparvine's guilt. Coviello, the Van Dusens' neighbor, testified that between 5:15 p.m. and 5:45 p.m. on November 25, 2003, the day before their bodies were discovered, he saw Rick driving the truck by himself and Karla following him driving their Jeep by herself. Cell *377 phone records indicated that the Van Dusens traveled through Deparvine's apartment complex area after leaving their home in Tierra Verde. One of the phone calls Karla made was to her mother, Billie Ferris, whose testimony indicated that the truck's purchaser was riding with Rick while they made their way to the Oldsmar area. Detective Keene confirmed Deparvine's status as the truck purchaser when he discovered a notarized bill of sale from Rick to Deparvine, dated November 25, 2003. Indeed, Deparvine's own testimony concedes that he was the truck purchaser. Deparvine's DNA in the form of blood was discovered on six different areas of the Jeep's steering wheel, and the evidence suggests that the Van Dusens were murdered in their Jeep. Most importantly, one of the blood spots was a mixture of Rick's and Deparvine's DNA; from this mixture of DNA, a reasonable jury could infer that both men were bleeding at the same time and that Deparvine was not only present when Rick was being murdered, but he was in fact the murderer. Further, Harrington testified that Deparvine wanted to purchase Harrington's truck in August 2003, but before he did, he wanted to take the truck to Oldsmar. The Van Dusens' bodies were discovered along a dirt road in Hillsborough County, next to a residence, approximately one mile east of Oldsmar. Finally, the truck was discovered in Deparvine's possession. Taken in the light most favorable to the State, it was reasonable for the jury to infer from this evidence that Deparvine murdered the Van Dusens in order to take permanent possession of their truck. Additionally, as more particularly noted below in the proportionality analysis for the CCP aggravator, the evidence suggests that the murders were premeditated.
Second, the State presented substantial competent evidence that is inconsistent with any reasonable hypothesis of innocence. Deparvine's theory is that the Van Dusens came to his apartment on November 25, 2003, to complete the transaction for the purchase of the truck. He argues that after he lawfully purchased the truck by paying the remaining balance of $5,000 in cash, Rick rode away in a similar red vintage truck driven by a man who looked like Deparvine followed by Karla driving the Jeep. Deparvine testified that he never saw them again. However, no other evidence of another truck and driver was presented, and this theory is directly contradicted by Ferris's testimony that the truck's purchaser was riding with them to Oldsmar as well as the other evidence of Deparvine's guilt.
Deparvine further contends that his blood was transferred to the Jeep's steering wheel on November 23, 2003, when he had the opportunity to drive the Jeep after his hand had been cut open while priming the carburetor on the truck. This theory is inconsistent for several reasons. First, the State presented testimony that it was highly unlikely that Rick would have allowed six blood stains to remain on the steering wheel for two days. Rick's coworker, Wilson, testified that he rode in the Jeep on November 25, 2003, and noticed that the Jeep was in "immaculate condition"; he did not notice any of the six stains on the steering wheel. Second, in its rebuttal case, the State recalled Detective Hoover, who testified that he interviewed Deparvine the day after the victims' bodies were discovered. Hoover testified that Deparvine stated that when the truck ran out of gas, he and Rick walked back to the house to get a can of gas. When they arrived, "he, Rick and Karla drove back to get gas and filled the truck up." This testimony contradicts Deparvine's trial testimony that only he and Rick went to retrieve the truck. Additionally, it contradicts his theory *378 that he drove the Jeep because Karla was present and she, not Deparvine, could have driven the Jeep back home. Third, this theory is inconsistent by itself. After the truck ran out of gas and Deparvine allegedly primed the carburetor, Deparvine never drove the truck again. Nevertheless, Deparvine alleges that he was still willing to purchase the truck despite its mechanical failure and no additional test drives. The State having met the threshold burden of introducing competent evidence that was inconsistent with the defendant's theory of events, it became the jury's duty to determine "whether the evidence fails to exclude all reasonable hypotheses of innocence . . . and where there is substantial, competent evidence to support the jury verdict, we will not reverse." Law, 559 So.2d at 188. Accordingly, we hold that there was sufficient evidence to support Deparvine's murder convictions, and we affirm the jury's verdicts of guilt.

PENALTY-PHASE CHALLENGES

I. VICTIM IMPACT EVIDENCE
Deparvine challenges the penalty phase on several grounds. First, he argues that the trial court erred in allowing the State to introduce five victim impact witnesses. Before these five witnesses testified, trial counsel objected, arguing that five witnesses would be redundant, would have excessive impact, and might prevent a fair trial. The trial court overruled the objection. Initially, we reject this claim because Deparvine does not specify what part of the testimony was repetitive and therefore fails to sufficiently identify the error. Nevertheless, even if Deparvine properly asserted this claim, we reject it on the merits.
Victim impact evidence is designed to show "each victim's `uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." Payne v. Tennessee, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); see also  921.141(7), Fla. Stat. (2003). The admission of victim impact testimony is reviewed for abuse of discretion. Schoenwetter v. State, 931 So.2d 857, 869 (Fla. 2006) (citing Zack v. State, 911 So.2d 1190 (Fla.2005)).
While being alert to the possibility of undue focus, this Court has never drawn a bright line holding that a certain number of victim impact witnesses are or are not permissible. In terms of numbers, this Court has affirmed up to four witnesses for one victim and consistently upheld three. Belcher v. State, 961 So.2d 239, 257 (Fla.) (four witnesses), cert. denied, ___ U.S. ___, 128 S.Ct. 621, 169 L.Ed.2d 400 (2007); see also Schoenwetter, 931 So.2d at 870 (three witnesses); Huggins v. State, 889 So.2d 743, 765 (Fla.2004) (same).
In Deparvine's case, three witnesses were presented on behalf of Rick and two witnesses were presented on behalf of Karla. Because victim impact evidence is designed to show "each victim's `uniqueness as an individual human being,'" the trial court was well within its discretion, and this Court's precedent, to allow three witnesses to testify for Rick and two for Karla. See Payne, 501 U.S. at 823, 111 S.Ct. 2597. "Family members are unique to each other by reason of the relationship and the role each has in the family." Bonifay v. State, 680 So.2d 413, 420 (Fla.1996). Thus, the fact that more than one family member testifies about one victim does not make their testimony repetitive. For example, both Meyers and Ferris testified that Karla was their best friend and confidante. However, because Meyers and Ferris are distinct from each other, this testimony is not repetitive. Accordingly, even *379 if Deparvine had sufficiently pleaded this claim, the trial court did not abuse its discretion in permitting the State to present five witnesses for victim impact testimony in this case.
We also reject the related claim that the trial court erred in permitting the victim impact witnesses to display photographs during their testimony. Deparvine did not object specifically on this basis, and thus this claim is procedurally barred on appeal. Windom v. State, 656 So.2d 432, 438 (Fla.1995). Furthermore, this Court can only assume which photographs were displayed because the photographs do not have identification numbers that correspond with their testimony. There were a total of five different photographs submitted as the State's photographic evidence during the penalty phase. Deparvine's description of what transpired at trial suggests that there were more photographs, but a review of the exhibits submitted to this Court reveals only five. Accordingly, we reject this claim as procedurally barred and insufficiently pleaded.

II. JUROR CHALLENGE
Next, Deparvine argues that the trial court erred by granting the State's for-cause challenge of juror Daryl Rucker. The State argues that defense counsel failed to properly preserve the issue for review, but even if he did, the trial court did not abuse its discretion in excusing juror Rucker because he stated that he would hold the State to a higher burden of proof than the law requires.
We agree with the State that Deparvine did not preserve this issue for review. The State argued that juror Rucker should be excused because "I asked him point blank are you telling me that because the death penalty is a potential crime that you'd require a higher standard of proof than beyond a reasonable doubt and he said I guess I am." The trial court agreed, and defense counsel responded, "Judge, I'll object to that for the record." Defense counsel did not make any specific objections as to this for-cause challenge. The law is clear that unless trial counsel objects with specific grounds when the trial court excludes a juror for cause, review of the trial court's decision is procedurally barred on appeal. Fernandez v. State, 730 So.2d 277, 281 (Fla.1999). Accordingly, we hold that Deparvine is procedurally barred from raising this issue on appeal.

III. FLORIDA'S CAPITAL SENTENCING SCHEME
Next, Deparvine claims that Florida's capital sentencing scheme, section 921.141, Florida Statutes (2003), is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it allows a judge, rather than a jury, to find the aggravating factors for a death sentence, and because it does not require jury unanimity in making its recommendation. As the State points out, however, Deparvine's claim is without merit since it is undisputed that he has prior felony convictions and this Court has held that the existence of such convictions as aggravating factors moots any claim under Ring. See Marshall v. Crosby, 911 So.2d 1129 (Fla.2005). Accordingly, we reject this claim.

IV. SENTENCING ORDER
Deparvine also challenges the trial court's sentencing order, arguing that it is defective because it fails to clearly indicate what mitigating circumstances were found, and because it fails to address Dr. Eric Rosen's testimony regarding Deparvine's mental health disorders. Initially, we reject Deparvine's argument that the trial court did not clearly indicate what mitigating *380 circumstances it found. Although bundled into one paragraph, the trial court clearly found that Deparvine: (1) suffered from serious emotional deprivation as a child because of familial dysfunction; (2) suffered from inability to form and maintain close relationships with others; (3) suffered from estrangement from some family members; (4) persevered after marrying his teenage girlfriend, who had become pregnant, and worked hard to put himself through college and law school; and (5) was once a true family man and his children grieve at the predicament they found him in.
However, we agree with Deparvine that the trial court failed to expressly evaluate Dr. Eric Rosen's testimony regarding Deparvine's mental health disorders. The trial court made no references to Dr. Rosen's Spencer hearing testimony, which indicated that Deparvine showed "elevated scales for depression and also for psychopathic deviance," and that although he does not suffer from a "full personality disorder," he suffers from personality disorder traits, or features, "that fit for depressive personality, antisocial personality and borderline personality traits." Dr. Rosen explained that these "[p]ersonality disorder features fit with mental disorders. . . . So it would qualify as a mental health disorder," as recognized in the Diagnostic and Statistical Manual. Dr. Rosen testified that Deparvine's mood element was consistent with a dysthymic condition, which is akin to a "low grade depression." On cross-examination, Dr. Rosen testified that dysthymic mood disorder is "a chronic depression," though not a severe depression. Nevertheless, Dr. Rosen testified that dysthymia does not impair decision-making in a significant way and that even if Deparvine was suffering from that condition on the day of the murders that he would know right from wrong and would be capable of planning and executing a premeditated murder and carjacking. Dr. Rosen also testified that Deparvine was above average in intellect, exceeded eighty-one percent of other adults his age, and that his personality disorder shaped the choices he made, but did not limit his ability to make choices.
This Court has described the need for trial courts to enter sentencing orders "expressly evaluat[ing]" the defendant's proposed mitigation. Campbell v. State, 571 So.2d 415, 419 (Fla.1990), receded from on other grounds by Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). Since Campbell, this Court has held:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. See [Campbell, 571 So.2d] at 419. . . . After finding mitigating circumstances, the court must expressly consider in its written order each established mitigating circumstance and then must weigh the aggravating circumstances against the mitigating circumstance, in order to facilitate appellate review. See Campbell, 571 So.2d at 420.
Rogers v. State, 783 So.2d 980, 995 (Fla. 2001). Although Deparvine's sentencing order states that "according to the testimony of Dr. Eric Rosen, the defendant is less capable than emotionally healthy people of forming and maintaining close relationships with others," we note that nothing else is said about Dr. Rosen's mental health examinations and conclusions. Furthermore, the trial judge was expressly made aware of Dr. Rosen's testimony as mitigating evidence when, on November *381 22, 2005, the same day as the Spencer hearing, defense counsel filed a sentencing memorandum listing Dr. Rosen as "additional mitigating factors presented to the court" and describing Dr. Rosen's opinion regarding Deparvine's dysthymic mood disorder. Accordingly, we conclude the trial court erred in not giving more express consideration of this mitigation pursuant to this Court's mandate to expressly evaluate each mitigating circumstance.
We conclude, however, that any error in not treating this mitigation in greater detail was harmless beyond a reasonable doubt. The trial court found four aggravating circumstances, including CCP and prior violent felony, which we have said are among the weightiest of aggravators,[24] and gave them all "great weight." Little weight was given to the mitigating circumstances that the order described, including Dr. Rosen's testimony. Even if the trial court had given Deparvine's dysthymic conditionÔÇöi.e., depressionÔÇögreater weight than any other mitigator it found, there is no reasonable doubt that the trial court would have imposed the death penalty, particularly in view of the double murder involved in this case. See, e.g., Thomas v. State, 693 So.2d 951, 953 (Fla.1997) (holding that the trial court's failure to evaluate mitigation evidence was error, but harmless because there was no reasonable doubt that the trial court would have imposed the death penalty in light of finding five aggravating circumstances); see also Cook v. State, 581 So.2d 141, 143-44 (Fla. 1991) (holding that trial court erred in failing to mention mitigation evidence, but that the error was harmless "particularly in view of the double murder involved in this case"). Accordingly, we conclude the trial court's failure to expressly evaluate Dr. Rosen's testimony regarding Deparvine's mental health disorders as mitigation was harmless beyond a reasonable doubt.

V. PROPORTIONALITY
Although Deparvine does not challenge the proportionality of the death sentence in this case, this Court will nevertheless conduct a proportionality review. See  921.141, Fla. Stat. (2003). Proportionality review of death sentences derives in part from due process considerations that flow from the nature of this "uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. . . . Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law." Urbin v. State, 714 So.2d 411, 417 (Fla.1998) (quoting Tillman v. State, 591 So.2d 167, 169 (Fla.1991)). "In conducting its proportionality review, this Court must compare the totality of the circumstances in a particular case with other capital cases to determine whether death is warranted in the instant case." Rimmer v. State, 825 So.2d 304, 331 (Fla. 2002) (citing Bates v. State, 750 So.2d 6 (Fla.1999); Urbin, 714 So.2d at 416). This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Urbin, 714 So.2d at 416.
The trial court in this case found four statutory aggravators and gave them all great weight. The first of these aggravators, CCP, is among the most serious aggravators set out in the statutory sentencing scheme. See Larkins, 739 So.2d at 95. "CCP involves a much higher degree of premeditation" than is required to *382 prove first-degree murder. Foster v. State, 778 So.2d 906, 921 (Fla.2001). The trial court based its finding on the fact that Deparvine "executed a well-thought-out and time-consuming plan to acquire the truck." The record demonstrates that application of this aggravating factor is supported by competent, substantial evidence. The trial court found that on October 26, 2003, Deparvine placed a one-day classified ad in a newspaper offering to sell a non-existent Rolex watch. Deparvine later claimed he had been given such a watch by a fellow inmate. The plan was to claim, if asked, that he used the proceeds from the sale of the watch to purchase the truck. The defendant also knew he would need to obtain a bill of sale from the truck owner prior to the completed sale because the truck owner was not going to survive a completed sale. After executing the bill of sale, the victims and Deparvine drove at night from St. Petersburg to Oldsmar in two vehicles, the truck and the victims' Jeep. After shooting the victims in the head from the back seat of the Jeep with a concealed pistol he had brought for the occasion, Deparvine dumped the bodies in a dark dirt driveway in the woods near Oldsmar. Deparvine then drove the Jeep to where the truck had been left in Oldsmar, parked the Jeep, and took the truck to his home in St. Petersburg. But before he left the Jeep, he placed a Florida identification card, which had been lost some weeks previously by Deparvine's former neighbor, on the pavement by the driver's door.
The second aggravator, pecuniary gain, rests on the trial court's finding that the "murders were committed to facilitate the theft of the victims' truck worth several thousand dollars." To establish this aggravator, "the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995) (citing Clark v. State, 609 So.2d 513, 515 (Fla.1992); Peek v. State, 395 So.2d 492, 499 (Fla.1980)). This factor is supported by competent, substantial evidence because the victims' truck was discovered in Deparvine's possession after the murders.
The third aggravator, under sentence of imprisonment, rests on testimony that Deparvine was on conditional release at the time of the murders. "This Court has held that evidence of a defendant on conditional release at the time of the murder is sufficient to satisfy the `under sentence of imprisonment' aggravator." Lawrence v. State, 831 So.2d 121, 136 (Fla. 2002) (citing Haliburton v. State, 561 So.2d 248, 252 (Fla.1990)). During the penalty phase, Officer Gordon testified that on April 28, 2003, Deparvine was released on conditional release from a sentence he was serving for possession of a firearm by a felon and carrying a concealed firearm. Thus, there is substantial competent evidence to support this aggravator.
The fourth aggravator, prior violent felony, rests on the contemporaneous murder convictions. "This Court has repeatedly held that where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim." Francis v. State, 808 So.2d 110, 136 (Fla.2001) (citing Mahn v. State, 714 So.2d 391, 399 (Fla.1998); Walker v. State, 707 So.2d 300, 317 (Fla.1997)). Qualitatively, this aggravator is among the most serious and weighty. See Sireci, 825 So.2d at 887.
As for mitigating circumstances, the trial court found that Deparvine suffered from serious emotional deprivation as a child because of familial dysfunction, inability *383 to form and maintain close relationships with others, and estrangement from some family members. Nevertheless, Deparvine persevered, marrying his teenage girlfriend, who had become pregnant, and worked hard to put himself through college and law school. Deparvine was once a true family man and his children grieve at the predicament they found Deparvine in. The court gave little weight to these mitigating circumstances and noted that "[t]he defendant's life up until the time he first became a law violator does not seem to the court to be particularly remarkable." Qualitatively, this mitigation evidence is not significant. Indeed, the trial court gave the mitigating circumstances little weight. Even considering Deparvine's dysthymic condition, i.e., depression, there is no significant mitigation in this case, especially where Dr. Rosen testified that dysthymia does not impair decision-making in a significant way and that even if Deparvine was suffering from that condition on the day of the murders that he would know right from wrong and would be capable of planning and executing a premeditated murder and carjacking. See Pagan, 830 So.2d at 815-17 (finding the death penalty proportionate where three aggravating circumstances (previous violent felony, capital felony committed while engaged in the commission of armed burglary and armed robbery, and CCP) weighed against a lack of significant mitigation (childhood deprivation, attention deficit disorder, borderline personality disorder, loving family member and friend, and good conduct while in custody awaiting trial)).
We conclude that in comparison with analogous cases in which this Court ruled that death was a proportionate penalty, the sentence here is constitutionally proportionate. For example, in Anderson v. State, 574 So.2d 87 (Fla.1991), the defendant shot the victim in the victim's car after the victim gave the defendant a ride. Id. at 89. After dumping the victim's body in a wooded area, the defendant drove the victim's car to the Tampa airport, where he abandoned it, and kept the victim's satchel containing money. Id. We upheld the death sentence based on the trial court's finding of two aggravating circumstances (previous capital felony and pecuniary gain/CCP (merged)) and one mitigating circumstance (accomplice allowed to plead guilty to third-degree murder). Id. at 90 nn. 2-3, 95; see also Diaz v. State, 860 So.2d 960, 971 (Fla.2003) (finding the death penalty proportionate where two aggravators (CCP and previous capital/violent felony) were balanced against five statutory mitigating circumstances (no significant prior criminal history, extreme mental or emotional disturbance, impaired capacity, age, and the defendant's remorse and history of family violence)); Lawrence v. State, 691 So.2d 1068, 1075-76 (Fla. 1997) (upholding death sentence based on three aggravating factors (under sentence of imprisonment, previous violent felony, and pecuniary gain) and evidence of the defendant's mental and emotional disturbance and drug and alcohol abuse as a mitigating factors); Hill v. State, 688 So.2d 901, 903, 907 (Fla.1996) (upholding death sentence where defendant shot into a truck killing two passengers and wounding another, and the death sentence was based on two aggravating factors (prior violent felony involving contemporaneous murder convictions and CCP) and one statutory mitigating factor (no significant history of prior criminal activity)); Pope v. State, 679 So.2d 710, 712 n. 1, 716 (Fla. 1996) (holding death penalty proportionate where pecuniary gain and prior violent felony aggravators outweighed two statutory mitigating circumstances (influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality *384 of conduct) and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927, 929, 931 (Fla.1994) (holding death penalty proportionate where pecuniary gain and prior violent felony aggravators outweighed some nonstatutory mitigation).
Deparvine's case is unlike Urbin, where this Court found that the death penalty was disproportionate when the prior violent felony and pecuniary gain aggravators were balanced against substantial mitigation (impaired capacity, parental abuse and neglect, mother incarcerated during defendant's formative years), including the defendant's age, which was a weighty mitigator. 714 So.2d at 417.
Accordingly, we conclude, based on our qualitative review of the basis underlying each aggravator and mitigator and comparison with similar cases, that death is a constitutionally proportionate punishment for Deparvine.

CONCLUSION
In accord with the above analysis, we affirm Deparvine's convictions and sentences.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, and BELL, JJ., and CANTERO, Senior Justice, concur.
LEWIS, J., dissents with an opinion, in which QUINCE, C.J., concurs.
LEWIS, J., dissenting.
I dissent because the majority's analysis of the admitted statements swings the door wide open to indiscriminately welcome the admission of unlimited hearsay into evidence, contrary to established precedent. The longstanding rules of evidence, sentinels guarding against the entry of unreliable out-of-court statements, are cast aside by the majority's analysis. Florida's case law has historically required that a statement contemporaneously describing an event be of a spontaneous nature. To be spontaneous, it is intrinsic that the event must have the character to trigger a statement that is a reflexive reaction and not a mere casual narrative. This simple and fundamental requirement of spontaneity is discarded by the majority's analysis and deemed unnecessary to transform these statements from rank hearsay to admissible testimony. Now, lacking the essential element of spontaneity, any statement made during any conversation that refers to the declarant's actions at the time of the utterance could be admissible.
The majority changes the course of Florida law based on the commentary of legal theorists. This analysis balks in the face of longstanding Florida precedent. Thus, I must respectfully decline to join in the unfettered broadening of the evidence rules and the unnecessary alteration of Florida case law.

I. IT IS A LONGSTANDING PRINCIPLE OF FLORIDA LAW THAT A SPONTANEOUS STATEMENT MUST BE TRIGGERED BY THE UNUSUAL EVENT.
It is basic and fundamental law that an out-of-court statement offered to prove the truth of the matter asserted is generally inadmissible unless the statement falls under a recognized exception to the rule against hearsay. See  90.802, Fla. Stat. (2003). An out-of-court statement is suspect because of four testimonial dangers: misperception, faulty memory, insincerity, and mistransmission. See Douglas D. McFarland, Present Sense Impressions Cannot Live in the Past, 28 Fla. St. U.L.Rev. 907, 913 (2001). Though this danger exists for all testimony, out-of-court statements are not subject to tests of *385 veracity, in that (1) the declarant is not testifying under oath; (2) the trier of fact cannot observe the declarant's demeanor, and (3) the declarant is not cross-examined. See Lyles v. State, 412 So.2d 458, 459 (Fla. 2d DCA 1982). Therefore, an additional condition must exist that eliminates at least some of the testimonial dangers. These conditions are considered exceptions to the hearsay rule.
For the spontaneous statement exception, Florida law has always required an event that provoked or elicited the spontaneous statement. It does not matter whether the event is cast as startling, exciting, unusual, or unexpected, just that it be an occurrence of a nature that produces a spontaneous and unreflecting utterance. See 6 John Henry Wigmore, Evidence in Trials at Common Law  1750 (1940). This unexpected occurrence alleviates the danger of insincerity and memory loss because a witness who is suddenly or unexpectedly confronted with an event will respond somewhat automatically with a truthful statement about the sudden event. Two of the four testimonial dangers are diminished because of the spontaneity and contemporaneousness of the statement. McFarland, 28 Fla. St. U.L.Rev. at 914. Thus, the spontaneity of the statement provides guarantees of trustworthiness.
A review of Florida case law clearly demonstrates that this rationale, originally developed under the res gestae exception of the common law, still applies under the current evidence code. In Hutchinson v. State, 882 So.2d 943 (Fla.2004), this Court stated that both the spontaneous statement and the excited utterance exception "require the declarant to be laboring under the influence of a starling event at the time that the statement is made." Id. at 951. The majority erroneously classifies this clear statement of longstanding Florida law as dicta "blurring the distinctions" between the two exceptions. Hutchinson, however, is the progeny of almost one hundred years of legal development of Florida's hearsay rules.
With the single, stray exception of Tampa Electric Company v. Getrost, 151 Fla. 558, 10 So.2d 83 (1942), the majority cites no other Florida decision to support its contention that the Florida courts have incorrectly interpreted the elements of the spontaneous statement exception. In every other case discussed by the majority, an unusual event or occurrence was an intrinsic and obvious catalyst to the statement at issue. While the majority dismisses the significance of these cases, which weigh heavily against its position, by listing them in a string cite, an analysis of the facts and applied law in these decisions reveals that Florida courts have absolutely required the additional element of spontaneity triggered by an event, unlike the Federal Rules of Evidence.

a. Pre-code cases: Florida's common law
Florida has historically applied a rule in this context flowing from the admission of res gestae. See Lambright v. State, 34 Fla. 564, 16 So. 582, 583-84 (1894) (discussing various authorities' theories on the rules of the res gestae in determining that shooting victim's statement identifying the murderer, uttered the morning after the event, was not a spontaneous utterance). The case law prior to the enactment of the evidence code demonstrates that under the umbrella of res gestae, the declarant's statement must necessarily spring from the described event to be spontaneous. These events are all of an unusual character that would trigger a reflexive statement.
In Goff v. State, 75 Fla. 87, 77 So. 877 (1918), the defendant in a first-degree murder trial asserted that he should have *386 been allowed to testify as to what happened after "the cutting." In analyzing whether these statements should have been admitted as a part of the res gestae, this Court explained:
To make declarations a part of the res gestae, they must be contemporaneous with the main fact; but, in order to be contemporaneous, they are not required to be precisely concurrent in time. If the declaration springs out of the transaction, if it elucidates it, if it is voluntary and spontaneous, and if it is made at a time so near to the main transaction as reasonably to preclude the idea of deliberate design, it is then to be regarded as contemporaneous.
Id. at 878 (emphasis supplied) (quoting State v. Garrand, 5 Or. 216, 217 (1874)); see also Johnson v. State, 63 Fla. 16, 58 So. 540, 541 (1912) (rejecting proposition that statement made hours after a melee, which ended in three deaths, was a spontaneous utterance of thoughts created by, or sprung out of, the fight); Vickery v. State, 50 Fla. 144, 38 So. 907, 908 (1905) (determining questions concerning a shooting were properly excluded because they lacked a showing that the hearsay statements were the product of, or part of "the difficulty itself," produced by the occurrences to which they related). Most people would agree that a knife fight resulting in a stabbing is an event startling or unusual enough to produce a spontaneous utterance. On a smaller scale, one can imagine the genuine and startled exclamation of pain uttered when a kitchen knife slips and slices a finger. The sudden adrenaline produced by a stabbing eliminates concerns about misperception and insincerity.
The same is true for statements made after a physical beating. For example, in a case previously before this Court, a man was "double teamed" by an uncle and nephew, struck in the head by a bottle, and shot. Within the two minutes following the beating, the victim told his aunt, who lived 70 to 100 yards away from where the fracas occurred, what had happened. This Court found that these statements were admissible because there was no time or motive to fabricate the story, and the short time precluded the idea of deliberate design by the deceased. In doing so, this Court relied on the following rule and authority:
It is often difficult to determine when declarations having relation to an act or transaction should be considered as part of the res gestae, and an equally great difficulty has been experienced in the effort to prescribe general rules for the admission of such. It may, however, be safely said that declarations which were the natural emanations or outgrowths of the act or occurrence in litigation, although not precisely concurrent in point of time, if they were yet voluntarily and spontaneously made so nearly contemporaneous as to be in the presence of the transaction which they illustrate and explain, and were made under such circumstances as necessarily to exclude the idea of design or deliberation, must upon the clearest principles of justice, be admissible as part of the act or transaction itself.
Washington v. State, 86 Fla. 533, 98 So. 605, 608 (1923) (emphasis supplied). Thus, the admission of the victim's statements depended upon them being uttered "in the presence" of the beating they described. Under today's code, these statements likely would be considered excited utterances, but the element of an event triggering the statement would still be required because the triggering event provides the requisite spontaneity to increase the reliability of the otherwise hearsay statements.
*387 In Washington v. State, 118 So.2d 650 (Fla. 2d DCA 1960), another decision upon which the majority relies, the statements obviously stemmed from the triggering event of a commotion occurring inside a house. Id. at 652. This altercation ended when the defendant shot his wife, which compelled the criminal trial. In the context of evidence in a criminal proceeding, the offense is very often the requisite event triggering the spontaneous statement. Therefore, when the district court discussed the origins of res gestae, it is clear that the terminology of a required "main fact" or "transaction" is equivalent to the usage of the terminology "event or condition" in the current statute, section 90.803(1), Florida Statute (2003).
Statements or acts of the injured person made or done at a time immediately prior to the offense or so near to it as to preclude the idea of forethought, and tending to elucidate a main fact in issue may be admissible as part of the res gestae. Further, the rule is well recognized that statements, exclamations, acts, and conduct of the injured person at a time substantially contemporaneous with the offense and so connected with the crime as to have a relevant bearing on it may be held admissible as part of the res gestae, whether they incriminate the accused or exonerate him.
Washington, 118 So.2d at 653 (emphasis supplied) (citation omitted). Any separation from "a main litigated fact" renders the statements inadmissible under this exception. Id. Without the altercation to provoke them, it is obvious that any comments made by the wife would not possess the required element of spontaneity. See also State v. Williams, 198 So.2d 21, 22-24 (Fla.1967) (determining victim's description of the event, made five to eight minutes after a shooting, was a natural emanation or outgrowth of the question, a necessary incident to explain the deceased's condition, and excluded the idea of design or deliberation while being substantially contemporaneous with the offense); Elmore v. State, 291 So.2d 617 (Fla. 4th DCA 1974) (statements made during shooting), overruled on other grounds by Martin v. State, 342 So.2d 501 (Fla.1977).
In Lawrence v. State, 294 So.2d 371 (Fla. 1st DCA 1974), the district court also utilized Wigmore's approach that the statements must be a spontaneous reaction or utterance stimulated by the excitement of the occasion to analyze statements emanating from a heated argument that turned into an "affray" ending in murder. Id. at 373. A feuding group tensely gathered at a tavern. The conversation turned heated as accusations were thrown regarding tampering with the rigging on a boat. The court held that the heated argument, which was otherwise wholly hearsay, was "stimulated by the excitement of the accusation which led to the shooting of decedent." Id.; see also Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975) (discussing spontaneous exclamation exception as applied to statement emanating from a knife fight). While Wigmore's approach thrives throughout Florida's jurisprudence, the Thayer approach, which the majority has chosen to follow, exists in Florida only in the commentary of legal theorists.
Even Tampa Electric, which the majority relies on as a pre-code case adopting the present sense impression, is clearly not controlling. In that decision, this Court did not identify the particular aspect of the res gestae under which it allowed the hearsay statements into evidence. The entirety of this Court's discussion consisted of the following excerpt:
The remaining question relates to the correctness of the ruling of the trial *388 court in denying a motion to strike certain testimony of the witness Lynch who, throughout the repair work, had been assisting Getrost [the deceased]. On his direct examination he testified at some length about use of the telephone by Getrost immediately prior to his death at the time it was contended by appellee he made the last call to the plant with reference to disconnecting the circuit. He did not hear the conversation but watched Getrost use the telephone and when the latter rejoined him he said he had had the circuit opened.
After all this testimony had been introduced on direct examination and after cross examination had proceeded to some extent the attorney for the appellant made his motion to strike, because it was hearsay, all the testimony about a report by Getrost to his helper that he had ordered the current discontinued. Even assuming that the objection was timely made, still we think the testimony was admissible in view of all of the circumstances. It will be recalled that these two men had been working together and the witness was entirely familiar with the procedure of telephoning the plant operator each time the line was energized or the current interrupted. He knew of the memorandum, containing the telephone number, that Getrost used in calling the plant and evidently saw him on the last occasion follow the same procedure as on previous ones. Considering the entire experience of the witness as an assistant to Getrost, his familiarity with the methods they were following and the conduct of Getrost immediately preceding the misfortune, it seems to us that the testimony cannot be said to have been improper.
We think the statement was not infected with the vices which make such declarations usually inadmissible. At the time it was uttered there was no occasion for it to have resulted from reflection or premeditation, nor was there motive to make it self-serving. Nothing in the record indicates that Getrost anticipated danger or injury until the moment he died.
Tampa Electric, 10 So.2d at 84-85 (emphasis supplied) (citation omitted). The statements included a discussion of the deceased's actions before his death. The opinion, however, does not identify under which particular aspect of the res gestae the statements were admissible. Additionally, the analysis does not discuss the spontaneity of the statement or indicate that the statement described an event. Instead, the Court found the testimony admissible in "view of all the circumstances," considering factors of reliability such as the witness's familiarity with the procedure. Reliance on this decision, which is the sole example of an unexciting event where the present sense impression was utilized to admit hearsay statements, is unfounded. That decision is outweighed by the entire body of applicable Florida decisions, which requires the descriptive statement to be a spontaneous response triggered by an unusual event.

b. Post-code cases: retaining the requirement of spontaneity
After enactment of the evidence code in 1979, Florida courts continued to require an occurrence startling enough to produce the spontaneous statement. In Lyles v. State, 412 So.2d 458, the Second District found no merit to the State's assertion that the victim's statements, made in response to a police investigator's questions more than 14 hours after the commission of the battery, were admissible as spontaneous statements. "In order for the spontaneous statement exception to the hearsay rule to be applicable, there must be some occurrence startling enough to produce nervous *389 excitement and render the utterance spontaneous and unreflecting." Id. at 460 (emphasis supplied). The holding of the Second District could not be more clear with regard to this issue. The record failed to demonstrate that the victim was under the stress of excitement caused by the event at the time she made the statement. Id. Thus, the statements were not admissible under this exception.
The essence of the res gestae rule persisted after adoption of the code. In Garcia v. State, 492 So.2d 360 (Fla.1986), this Court considered statements made by a victim to a police officer after a robbery of an elderly couple's farm market. The wounded victim described the robbery of the market and the defendant's shooting of the husband and wife. This Court held that her "response was spontaneous, sprang from the stress, pain and excitement of the shootings and robberies, and was not the result of any premeditated design." Id. at 365. "As a contemporaneous utterance, it was admissible under the res gestae rule." Id. (emphasis supplied). Again, this Court clearly described the stressed and excited conditions necessary for the admission of otherwise hearsay statements into evidence.
In a later case, the Second District applied the reasoning of Lyles to a victim's testimony concerning an altercation. See Quiles v. State, 523 So.2d 1261, 1263 (Fla. 2d DCA 1988). The district court held that the statements were neither spontaneous statements nor excited utterances because they were made to a police officer after the fight occurred. See id. These decisions required the spontaneous response to emanate from the event for application of both the spontaneous statement and the excited utterance exceptions.
Responses to questions after an unusual event have also been analyzed under the spontaneous statement exception. In one such case, the defendant returned home after striking a man with a machete. See McGauley v. State, 638 So.2d 973, 974 (Fla. 4th DCA 1994). Soon thereafter, a police officer knocked on the defendant's front door and the defendant leapt out of a back window. The Fourth District held that the wife's response to the officer's question about who had jumped out of the window was admissible under either the spontaneous statement or the excited utterance exceptions. Id. at 975.
In J.M. v. State, 665 So.2d 1135 (Fla. 5th DCA 1996), the Fifth District considered statements a drug buyer made identifying a drug seller. Following the seller's departure, a police officer approached and asked the buyer if he had drugs in his possession. The buyer looked at his hands, his lap, and his legs. When the officer spotted the drugs between the buyer's legs, the buyer identified the seller. The district court stated:
While the language in the statutory exception specifically includes the requirement that the purported spontaneous statements be made while the declarant perceives the event or condition, or immediately thereafter, contemporaneity is not the only requirement, but instead, the statement must also, of course, be spontaneous; that is, the statement must be made without the declarant first engaging in reflective thought.
Id. at 1137 (emphasis supplied). The district court applied this principle to the facts, and held that before the buyer made the statement implicating the seller, the buyer had time to engage in the very type of reflective thought that is inconsistent with the aspects of reliability upon which the spontaneous statement exception rests.
Continuing this line of precedent, in a murder trial, where the defense asserted that the victim committed suicide, the Second *390 District held that the defendant's statement to a neighborÔÇöthat the victim "asked me for a gun because he wanted to blow his head off . . . so I gave him the gun. I didn't think he was going to do it" ÔÇö qualified as a spontaneous statement under section 90.803(1). State v. Adams, 683 So.2d 517, 518 (Fla. 2d DCA 1996). The court relied on the principle presented in State v. Snowden, 345 So.2d 856 (Fla. 1st DCA 1977), that the admissibility of a spontaneous statement requires that the factors of contemporaneity and spontaneity relate to the perceived event so as to preclude any deliberation or fabrication. The district court held that the statement

clearly arose from the main event of the victim's suicide; described and explained the circumstances of that event; was made shortly after the suicide, while the circumstances surrounding that tragic event were still unfolding, so as to be contemporaneous with that event; and, more important, was spontaneously made under circumstances precluding deliberation or fabrication.
Adams, 683 So.2d at 521 (emphasis supplied). It is clear that the district court was applying Wigmore's interpretation of the spontaneous statement exception, rather than Thayer's version.
In the last two post-code cases discussed, the courts considered the admissibility of statements made during telephone calls. In State v. Skolar, 692 So.2d 309 (Fla. 5th DCA 1997), the district court held that a 911 call, detailing the defendant's claim of physical abuse by the victim and made several hours before the murder, did not qualify as either a spontaneous statement or an excited utterance because it was not made "as the result of a startling or stressful event." Id. at 311 (emphasis supplied).
Relying on Skolar, the district court later held that there was no error in the admission of testimony concerning what a victim said during phone calls made while the victim was being kidnapped and threatened. See Viglione v. State, 861 So.2d 511, 513 (Fla. 5th DCA 2003). The district court stated that this testimony was admissible either as a spontaneous statement or an excited utterance, because the victim's calls for help and pleas for money to obtain his release were made while under the stress of the event and were similar to a distressed victim's 911 call. See id. at 513.
Other than Tampa Electric, the only other decision advanced by the majority to support its adoption of Thayer's position is Ibar v. State, 938 So.2d 451 (Fla.2006). However, in that decision, this Court held that the statement was not admissible under the spontaneous statement exception because it did not describe an event. The disputed statement arose from the witness's testimony that the defendant came to her house the morning of the murder. When she asked the defendant to identify himself, he responded, "I'm Pablo." In deciding that the statement was inadmissible, this Court distinguished the two cases the State advanced to support its position because the statements involved in those cases were spontaneous in that "the declarant responded to an event." Id. at 466-67 (emphasis supplied) (discussing McGauley v. State, 638 So.2d 973, 974 (Fla. 4th DCA 1994) (holding that wife's response to officer's question, "Who jumped out of the back window?," was a spontaneous statement), and McDonald v. State, 578 So.2d 371, 373 (Fla. 1st DCA 1991) (holding that in a sexual battery case, the victim's statements to her friend, made immediately after the incident, were admissible as spontaneous statements)). Thus, even Ibar is clearly distinguished from the majority's reasoning and does not support the change adopted today.
*391 The above road map through the development of Florida evidence law concerning spontaneous statements demonstrates that the Florida courts have found that spontaneity, determined by its reflexive relation to an unusual event, is a required element for admissibility under this exception. To be spontaneous, the statement must be triggered by the event to which it relates. Florida courts have thus consistently required a strange, unusual, or otherwise out-of-the-ordinary event.

II. THE MAJORITY IGNORES LEGISLATIVE INTENT AND STARE DECISIS TO ALTER FLORIDA'S EVIDENCE CODE.
The majority bases its alteration of Florida law on a determination that the Legislature intended to adopt the spontaneous statement exception to mirror the federal present sense impression exception, which does not require an exciting or nervous stimulus as a condition for admission. Without identifying any Florida decisions to substantiate this reasoning, the majority focuses on "contemporaneousness" as the key and disregards spontaneity. In a footnote, the majority suggests that spontaneity is warranted by the contemporaneousness of the statement with the event. However, as the majority applies its holding to the facts of the current case, neither the guarantee of contemporaneousness nor spontaneity seem to be considered. Moreover, the majority fails to provide a single case that actually supports its holding, which disregards the requirement of a triggering event for the statement to be spontaneous.
The majority asserts that this adherence to precedent fails to denote a difference between the spontaneous statement and excited utterance exceptions. However, this assertion ignores the primary distinctions between the two related exceptions. A startling or extraordinary event is the link between the two exceptions, whereas temporality and content distinguish them. "The two exceptions differ mainly in the amount of time that may lapse between the event and the statement describing the event." State v. Jano, 524 So.2d 660, 661 (Fla.1988) (quoting 1 Charles W. Ehrhardt, Florida Evidence  803.2, at 473-74 (2d ed.1984)). An excited utterance need not be precisely contemporaneous with the event, while a spontaneous statement must be exclaimed contemporaneously. As to the content of the statement, a spontaneous statement is "limited to statements that `describe or explain' the event," while an excited utterance "must only `relate' to the event causing the excitement." Id. at 662. Thus, the excited utterance exception is necessarily different from the spontaneous statement exception because of the former's broader permissible time lapse and content. Despite these differences, the two exceptions are linked under the same rule because they both are triggered by an unusual, startling event.
A review of existing decisions suggests that the present sense impression is rarely used in the federal courts, and any analysis of the exception has surely been dicta because the statements could also be admitted under the excited utterance exception. The rejection of the present sense impression by many states reflects its controversial history. Florida is one of the five states that admit the statement under circumstances more limited than the Federal Rules of Evidence. Foremost, the term "present sense impression" is utterly absent from the Florida evidence code. Had the Legislature adopted that federal rule of evidence, it would have titled the exception "present sense impression," as it appears in the federal rules. Instead, the Legislature continued the prior judicial interpretation of the rule in adopting the rule, and purposely titled the exception as *392 a "spontaneous statement." As the statute is written, the complete lack of the term "present sense impression" reiterates the Legislature's decision to maintain the logical requirement of spontaneity.
Similarly in Colorado, the evidence code departs from its federal counterpart by defining the present sense impression as a "spontaneous statement." Colo. R. Evid. 803(1). Though the policies underlying both the Colorado rules and the federal rules were generally the same, the Colorado Legislature included spontaneity because "neither immediacy nor spontaneity would be guaranteed by the federal rule, and because Colorado case law required a present sense impression to be instinctive and spontaneous in order to be admissible." People v. Franklin, 782 P.2d 1202, 1205 (Colo.Ct.App.1989). Like Colorado, it appears that the Florida Legislature decided to enact a more limited exception than the federal rule by titling the exception "spontaneous statement" rather than "present sense impression." Thus, the title reflects the Legislature's clear intent to preserve the requirement of spontaneity triggered by an event for application of the exception. See Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So.2d 20, 25 (Fla.2004) (due weight and effect must be given to the title of a section because it is a direct statement by the Legislature of its intent). Furthermore, in applying the evidence code, Florida state courts have given weight to the legislative intent by requiring spontaneity triggered from the event the statement is describing. This new rule presented by the majority emerges from the highly controversial history of the present sense impression. There is no reason for this Court to reject a century of exceedingly clear precedent in favor of admitting rank hearsay into evidence. This complete reversal in our approach will cause enormous mischief in the future and turn criminal prosecutions on their head.[25]
To admit hearsay simply because the declarant made the statement while some mundane, normal event was occurring is to "introduce an arbitrary and unreasoned test and to remove all limits of principle." Wigmore, supra,  1757, at 168. As Wigmore wrote and the majority notes, the term "res gestae" "is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both." Id. at 182. It seems the majority suffers the harmful effects of this ambiguity in its *393 confusion over the requirement of a triggering event.
If the present sense impression is essentially and primarily the brainchild of commentators, not the courts, why should we ignore the well-established precedent of Florida that requires spontaneity in response to an unusual event merely because some legal theorists may profess that they believe this should be the law? Our evidence law has long been stable in this regard, and codified by the Legislature. The Legislature, in enacting the exception, was aware of the one hundred years of judicial construction of the exception, and presumptively adopted this prior construction, as noted by the titling of the exception as "spontaneous statement." See Fla. Dep't of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004) (Legislature is presumed to adopt prior judicial constructions unless a contrary intention is expressed). The courts should unwaveringly adhere to the doctrine of stare decisis unless there has been an error in legal analysis. See Puryear v. State, 810 So.2d 901, 905 (Fla.2002). To justify a departure from prior precedent, the relevant questions are:
(1) Has the prior decision proved unworkable due to reliance on an impractical legal "fiction"? (2) Can the rule of law announced in the decision be reversed without serious injustice to those who have relied on it and without serious disruption in the stability of the law? And (3) have the factual premises underlying the decision changed so drastically as to leave the decision's central holding utterly without legal justification?
N. Fla. Women's Health & Counseling Services, Inc. v. State, 866 So.2d 612, 637 (Fla.2003). Nothing in the majority's analysis demonstrates a need to change this settled law. There is no discussion of the prior decisions proving unworkable, or an indication that the factual premises underlying the decisions have changed so drastically that the requirement of a spontaneity triggered from an exciting event has no legal justification. Thus, the majority fails to provide any support for discarding one hundred years of Florida decisions and opens a door that will one day cause enormous harm.

III. EVEN UNDER THE MAJORITY'S ANALYSIS, THE STATEMENTS LACK GUARANTEES OF TRUSTWORTHINESS.
Even under the majority's analysis, the statements involved in this case fail to fall under the spontaneous statement exception as adopted today. By definition, the present sense impression must be uttered spontaneously while the declarant perceives the subject of the declaration. McCormick advocated for disposal of the exciting event requirement based on factors of reliability presented by Professor Morgan:
(1) they refer to observations being made at the time of the statement and are free from any defect of the memory; (2) they are made contemporaneous with the observation and there is little or no time for calculated misstatement; (3) they are made to a third person who will probably have an opportunity to observe the situation and provide a check on the accuracy of the declarant's statement; and (4) since the declarant will often be available for cross-examination his or her credibility will be subject to substantial verification before the trier of fact.
People v. Brown, 148 Misc.2d 70, 559 N.Y.S.2d 772 (N.Y.Sup.Ct.1989); see 2 McCormick on Evidence  271, at 251 (Kenneth S. Broun et al. eds., 6th ed.2006). At least three of the four factors are absent *394 in the present case.[26]
Foremost, with a narrative phone call, such as that admitted into evidence today, there is no guarantee of contemporaneousness. Here, the declarant made numerous phone calls on November 25, 2003. According to cell phone records, Karla spoke with her mother for approximately thirty-seven minutes. Her mother described her as a "long talker." After discussing unrelated things, Billie Ferris asked her daughter if she was in the car. The declarant allegedly happened to respond, "I'm following Rick and the guy that bought the truck. He knows where to get the paperwork done tonight." The conversation went on to discuss other subjects. This conversation is not even remotely similar to Florida decisions in which statements were admitted under the spontaneous statement exception. Though Deparvine's challenge specifically relates to the admission of Karla's mother's statements regarding where Karla was and who she was with, in essence, any statement in that conversation is admissible under the majority's reasoning.
The majority accepts these statements on the theory that Karla was describing a continuing present condition, yet nothing in the majority's analysis refutes the circumstance that she had time to contemplate and think about what response to make before engaging in this conversation. The definition of an "event" under the majority's interpretation is infinitely elastic because any statement made during a phone conversation that casually describes what the declarant may be doing falls under the exception, thereby allowing the spontaneous statement exception to consume the hearsay rule. The only guarantee that Karla made her statement contemporaneous to viewing the car in front of her depends on collateral evidence from the cell phone records. A common example of how simple it would be to fabricate one's location or activity over a cell phone is that of a driver running late for a meeting. It is very easy for a driver to state that he or she is passing a building a block away from where the meeting is located when in actuality the driver is miles away. Nothing protects or guarantees the reliability and veracity of this type of statement.
The last two guarantees of trustworthiness also do not apply to these facts. Karla's mother was not observing the situation, and thus cannot provide a check on the accuracy of Karla's statements. The declarant is also not available for cross-examination.
Without a single Florida case for support, the majority discards one hundred years of precedent to the contrary and simply follows the recommendation of legal commentators. The states independently formulate their respective rules of evidence, and Florida has created a more narrow exception than the federal standard. The Florida statutes are entirely devoid of any reference to the present *395 sense impression. This absence clearly demonstrates that to disregard the requirement that a spontaneous statement be triggered by the event is to rewrite the Florida Evidence Code. Thus, I must respectfully decline to join the majority's analysis.
QUINCE, C.J., concurs.
NOTES
[1] In its rebuttal case, the State recalled Detective Hoover, who testified that on November 27, 2003, he interviewed Deparvine. Hoover testified that Deparvine stated that when the truck ran out of gas, he and Rick walked back to the house to get a can of gas. When they arrived, "he, Rick and Karla drove back to get gas and filled the truck up."
[2] Deparvine was also indicted on two counts of kidnapping, but the trial judge granted a motion for judgment of acquittal on both counts.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] The State raises two cross-appeal issues, which we will not address because Deparvine's convictions and sentences are affirmed.
[5] For this Court's most recent discussion of the excited utterance exception, see Hudson v. State, 992 So.2d 96 (Fla.2008).
[6] Marsh v. Valyou, 977 So.2d 543, 556 (Fla. 2007); In re Florida Evidence Code, 376 So.2d 1161, 1162 (Fla.1979).
[7] Courts have used the term res gestae in various ways to describe:

(a) part of a relevant transaction the offered evidence of which has no hearsay aspect, (b) declarations of presently existing subjective symptoms offered in evidence as tending to prove the existence of those symptoms, (c) declarations of a presently existing mental condition offered in evidence as tending to prove that condition, its probable continuance and its previous existence, and to prove conduct in accord with that mental condition, (d) declarations of a past mental condition or of past symptoms, and (e) spontaneous statements or statements made contemporaneously with a relevant event or condition, evidence of which is offered as tending to prove the truth of the matter stated.
Edmund M. Morgan, The Law of Evidence, 1941-1945, 59 Harv. L.Rev. 481, 568 (1946). Professor John H. Wigmore writes:
The phrase `res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some well-established principle and can be explained in the terms of that principle. It is harmful because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of evidence can be created or applied by the mere muttering of a shibboleth.
6 John Henry Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law  1767, at 182 (3d ed.1940).
[8] Commenting on Professor Thayer's views, Edmund Morgan noted the impracticability of insisting "on exact contemporaneousnessÔÇöhe says `very near in time to that which they tended to prove, fill out or illustrate.'" Edmund M. Morgan, Res Gestae, 12 Wash. L.Rev. 91, 97 (1937) [hereinafter Morgan, Res Gestae].
[9] Morgan recognized seven categories where res gestae had been applied to introduce out-of-court statements. See generally Morgan, Suggested Classification, supra. Categories six and seven addressed, respectively, the modern-day spontaneous statement and excited utterance exceptions. Id. at 236, 238.
[10] Professor Thayer's view is reflected in McCormick:

Although these statements [(declarations concerning nonexciting events)] lack whatever assurance of reliability is produced by the effect of an exciting event, other factors offer safeguards. First, since the report concerns observations being made at the time of the statement, possible errors caused by a defect of the declarant's memory are absent. Second, a requirement that the statement be made contemporaneously with the observation means that little or no time is available for calculated misstatement. Third, the statement will usually have been made to a third person (the witness who subsequently testifies to it), who was also present at the time and scene of the observation.
2 McCormick, supra,  271, at 251.
[11] Act of Jan. 2, 1975, Pub.L. No. 93-595,  1, 88 Stat. 1926.
[12] McCormick explains:

The notion that parties' out-of-court statements could not be evidence in their favor because of the "self-serving" nature of the statements seems to have originated with the now universally discarded rule forbidding parties to testify. When this rule of disqualification for interest was abrogated by statute, any sweeping rule of inadmissibility regarding self-serving statements should have been regarded as abolished by implication.
. . . [Under the hearsay rules], no specific rule is necessary to exclude self-serving out-of-court statements if not within a hearsay exception. If a statement with a self-serving aspect falls within an exception to the hearsay rule, the judgment underlying the exception that the assurances of trustworthiness outweigh the dangers inherent in hearsay should be taken as controlling, and the declaration should be admitted despite its self-serving aspects.
2 McCormick, supra,  270, at 248 (footnotes omitted).
[13] Some cases also have admitted statements made before the act or occurrence in litigation under the rationale that the statements are "so connected with the crime as to have a relevant bearing on it." Washington, 118 So.2d at 653. In Washington, the Second District noted that

A more liberal statement of the rule as announced by many recent decisions is that, not only such declarations and acts as accompany the transaction are admissible as parts of the res gestae, but also such as are made or performed under such circumstances as will raise a reasonable presumption that they are the spontaneous utterance or act created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they were the result of premeditated design.
Id. (quoting "Syllabus by the Court" in Goff v. State, 75 Fla. 87, 77 So. 877 (1918)). Thus, in Washington, a prosecution of the defendant for murdering his wife, the court held that the trial court did not abuse its discretion in admitting the testimony of a witness that went to the defendant's home, and after knocking at the door, heard the deceased say, "George, there's the St. Petersburg man," referring to the witness. Id. at 652. The deceased then came to the door and stated that "George has been drinking and is waiving an old pistol. I will catch you next week." Id. The deceased then said, "George, get back in there. Don't go out there. That's a white man; he will kill you." Id. As the witness walked away from the home, he heard a shot and a sound as if someone fell. Id. In finding that the statements constituted part of the transaction, the court observed that the statements were made immediately prior to the shooting, and the circumstances indicated that the statements did not result from any forethought or premeditation. Id. at 654. It is not clear whether the court applied Wigmore's or Thayer's theory. On the one hand, the statements did not emanate from the act or occurrence in litigation, which was a murder. Nevertheless, the statements arguably emanated from an exciting event, i.e., George was waving an old pistol. On the other hand, the court began its analysis by citing a rule of law, quoted above, that was more akin to Thayer's theory. The court mostly seemed concerned with circumstances indicating reliability. See id.
[14] These components are embodied in section 90.801(1)-(3), Florida Statutes (2007). Alexander v. State, 627 So.2d 35, 43 (Fla. 1st DCA 1993).
[15] In 1974, Professor Charles W. Ehrhardt wrote about Florida's proposed evidence code. See generally Charles W. Ehrhardt, A Look at Florida's Proposed Code of Evidence, 2 Fla. St. U.L.Rev. 681 (1974). With respect to spontaneous statements, he wrote, "If out-of-court statements were made spontaneously in reaction to a stimulus, there is little likelihood that the declarant had the motive or opportunity to falsify since the statements were made before the opportunity to falsify arose." Id. at 691. He did not, however, discuss what he meant by "stimulus." Instead, he continued, "When a statement is made contemporaneously with an event and the statement explains the event while, or immediately after, the declarant perceives it, the Code recognizes the statement's admissibility." Id. at 692. The excited utterance was distinguished as not requiring the same degree of contemporaneity "if the statement is made while the declarant is under the stress of excitement caused by an event," and the "statement relates to the event causing the excitement." Id.
[16] The Advisory Committee cited Edmund Morgan, who, as noted above, advocated for recognition of Professor Thayer's view and drafted the rule adopted by the ALI, which was worded substantially similar to the current federal and Florida rule and noted that it was an adoption of Thayer's view. Fed. R.Evid. 803(1) advisory committee's note. The Law Revision Council also noted that the guarantee of trustworthiness in excited utterances is that "the circumstances produce a condition of excitement which temporarily stills the capacity of reflection and produces utterance free of conscious fabrication." 6C Fla. Stat. Ann. 268 (West Publishing Co.1979) (Law Revision Council noteÔÇö1976). This language is strikingly similar to Professor Wigmore's endorsement of a spontaneous exclamation exception, wherein he stated, "Under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." 6 Wigmore, supra note 5,  1747, at 135.
[17] The dissent is concerned that our approach will cause enormous mischief in the future in criminal prosecutions. Our approach, however, essentially holds that Florida's spontaneous statement is similar to the federal present sense impression exception, but with this added provision. In fact, federal courts have applied a broader version of Florida's spontaneous statement exception for over thirty years, and there is no evidence indicating criminal prosecutions in the federal courts have been radically affected.
[18] Although Professor Ehrhardt states, "[S]pontaneity is the key," Ehrhardt, Florida Evidence, supra,  803.1, at 843, contemporaneousness has always been the critical factor underlying Thayer and Morgan's theory. Morgan specifically noted that "[c]ontemporaneousness, not spontaneity, is the test." Res Gestae, supra note 6, at 96. Morgan explained that "the spontaneity of the utterance is warranted by its contemporaneousness with the event." Morgan, Suggested Classification, supra note 7, at 237.
[19] The dissent contends that Florida pre-evidence code case law applied Wigmore's theory, not Thayer's theory. As the majority opinion explains, some of Florida pre-evidence code case law did apply Wigmore's theory, and the Florida Legislature subsequently codified that theory in enacting section 90.803(2), the excited utterance exception to the hearsay rule of exclusion. However, our opinion further explains that the Florida Legislature also adopted Thayer's theory and embodied that theory in section 90.803(1), the spontaneous statement exception. In analyzing the spontaneous statement exception, however, the dissent focuses on the nature of an "event" and argues that only an unusual event can trigger a statement that qualifies as spontaneous. Under the dissent's view, there would be virtually no difference between a spontaneous statement and an excited utterance. Importantly, if the Legislature wanted an "event" under spontaneous statements to be qualified by something "unusual" then it would have said so as it did in defining an excited utterance. See  90.803(2), Fla. Stat. (2003) ("startling event or condition" (emphasis supplied)).
[20] We reject Deparvine's argument that responses to questions cannot qualify as spontaneous statements. Responses to questions do not necessarily diminish contemporaneousness. See, e.g., State v. Adams, 683 So.2d 517, 521 (Fla. 2d DCA 1996); McGauley v. State, 638 So.2d 973, 973-74 (Fla. 4th DCA 1994). Even under the res gestae line of cases, a response to a question did not diminish reliability. See Williams, 198 So.2d at 22-23. At least one other jurisdiction, however, has stated in dicta that "[a]n answer to a question is not a present sense impression." State v. Martinez, 105 Wash.App. 775, 20 P.3d 1062, 1067 (2001) (citing State v. Hieb, 39 Wash. App. 273, 693 P.2d 145 (1984), rev'd on other grounds, 107 Wash.2d 97, 727 P.2d 239 (1986)). We disagree with this statement.
[21] See Mordenti v. State, 982 So.2d 710 (Fla. 2d DCA 2008); Mariano v. State, 933 So.2d 111 (Fla. 4th DCA 2006); McDonald v. State, 578 So.2d 371 (Fla. 1st DCA 1991). In each of these cases the district courts used the words "blurted out" to convey the same meaning as the declarant making a spontaneous statement. Indeed, the words "spontaneous" and "blurt" have almost identical meanings. See Merriam-Webster's Collegiate Dictionary 126 (10th ed.2001).
[22] The dissent contends that under our analysis, any statement during the telephone conversation between Karla and her mother may be admissible. Our analysis and conclusion here, however, specifically refutes this assertion. The dissent also contends that there are no guarantees of trustworthiness demonstrating that Karla made these statements while perceiving the event. Specifically, the dissent contends that Karla's mother cannot provide a check on the accuracy of Karla's statements because she, the mother, was not observing the situation, and Karla is not available for cross-examination. However, the statutory spontaneous statement exception requires neither corroboration nor availability to be demonstrated by additional evidence in order for the statement to be admissible. Of course, as noted above, the Florida exception does caution courts to consider whether the statement was made under circumstances that indicate its lack of trustworthiness.
[23] The only discussion on the carjacking charge instructions at trial related to whether the court should instruct on lesser included offenses.
[24] See Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002); Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
[25] Though the majority claims that the federal courts have applied a broader version of this exception without radical affect, as discussed at the beginning of the previous paragraph, the effect of the exception is difficult to gauge because it is used rarely. A broad search of federal court case law for the past 30 years reveals a mere 506 cases discussing the present sense impression from all the federal courts. See generally McFarland, 28 Fla. St. U.L.Rev. at 913 (stating that as of 2001, an averaging of the reported decisions discussing the present sense impression equaled less than one case per court per twenty-five years). However, as the majority refuses to acknowledge, a majority of these cases analyze the exception in conjunction with the excited utterance exception. Thus, a startling event is generally the impetus for the statement. The United States Supreme Court has only touched on the present sense impression twice, with neither opinion directly analyzing the exception. See Giles v. California, ___ U.S. ___, 128 S.Ct. 2678, 2699-2700, 171 L.Ed.2d 488 (2008) (Breyer, J., dissenting) (in a hypothetical, analyzing the present sense impression in conjunction with the excited utterance exception); Davis v. Washington, 547 U.S. 813, 820, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (discussing a case not before the court, where the affidavit admitted as a present sense impression stemmed from an interview about a domestic disturbance, in which the husband continued the startling nature of the event by continually and angrily interrupting the police interview of the wife).
[26] The majority correctly notes that these factors of reliability are not required by the evidence code. However, the theorists relied upon by the majority based their reasoning on these reliability factors. As discussed previously, hearsay becomes admissible when certain conditions eliminate some testimonial dangers. Because unexcited statements of present sense impression lack the assurance of reliability produced by the effect of a startling event, Professor Morgan's arguments for recognizing a nonexciting event exception were premised on the above factors of reliability. McCormick, supra,  271, at 251. The majority ignores these factors, which were the foundation of the argument for the exception they choose to adopt. It is obvious these reliability factors would not be discussed in the Florida rules because the Legislature never intended for statements from a nonexciting event to be admissible.